# 22-0343-cv

# United States Court of Appeals

*for the*

# Second Circuit

————————————————

ANGEL HERNANDEZ,

*Plaintiff-Appellant,*

– v. –

THE OFFICE OF THE COMMISSIONER OF BASEBALL,
MAJOR LEAGUE BASEBALL BLUE, INC.,

*Defendants-Appellees.*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT
## (FILED UNDER SEAL)

NICHOLAS R. GREGG
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive,
  Suite 200
Fort Mitchell, Kentucky 41017
(859) 360-1123

– and –

NICHOLAS J. ZAITA
PECKAR & ABRAMSON, P.C.
70 Grand Avenue
River Edge, New Jersey 07661
(201) 343-3434

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**TABLE OF CASES, STATUTES AND OTHER AUTHORITIES**...................4

**JURISDICTIONAL STATEMENT**...................................................6

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**................6

**STATEMENT OF THE CASE**......................................................7

    **I.**    **Factual Background**..........................................................7

        A.    *Few Minority Candidates for Promotion & Zero Minority Crew Chiefs*..............................................................8

        B.    *The Crew Chief Position*.........................................10

    **II.**    **The use (or lack of use) of performance evaluations when promoting**............................................................13

    **III.**    **MLB's Diversity Policy and its impact (or lack thereof) on promotions**.............................................................14

    **IV.**    **Mr. Hernandez's qualifications to serve as permanent crew chief**15

    **V.**    **Mr. Hernandez's actual experience as an interim crew chief**..........17

        A.    *MLB's promotion of white umpires to be permanent crew chiefs* 17

    **VI.**    **Procedural Background**....................................................20

**SUMMARY OF ARGUMENT**......................................................21

**ARGUMENT**.............................................................................23

    **I.**    **Disparate Impact Can Be Established by Statistical Proof, But It Can Also Be Demonstrated by the Presence of the "Inexorable Zero"**.............................................................24

        A.    The Inexorable Zero..............................................25

        B.    Small Sample Sizes Render the Traditional Statistical Analysis Unreliable................................................26

        C.    Whether the Small Sample Size from 2011-2017 was a Result of MLB's Own Conduct..........................................29

        D.    The District Court's Ruling Creates Improper Incentives That Are Inconsistent with the Law and Policy of the Second Circuit .........................................................30

        E.    The Law of This Circuit Does Not Support Granting MLB's Cross-Motion for Summary Judgment as to Mr. Hernandez's Disparate Impact Claim...........................................32

F.     MLB Failed to Prove Job-Relatedness/Business Necessity .....37

G.     Mr. Hernandez's Proposed Alternative Practices Were Sufficient to Create Genuine Disputes of Material Fact...........39

**II.    The District Court Improperly Assumed the Role of Factfinder** .42

**CONCLUSION**....................................................................................45

**CERTIFICATE OF COMPLIANCE** .................................................47

# TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

## Cases

*Banks v. City of Albany*,
   953 F. Supp. 28 (N.D.N.Y. 1997) ...................................................... 36, 37, 39, 40

*Bos. Chapter, N.A.A.C.P., Inc. v. Beecher*,
   504 F.2d 1017 (1st Cir. 1974) .............................................................................26

*Brennan v. City of White Plains*,
   No. 97 CIV. 2709 (RWS), 1998 WL 75692 (S.D.N.Y. Feb. 20, 1998)...............29

*Caban v. City of New York*,
   No. 11 CIV. 3417 SAS, 2012 WL 5992088 (S.D.N.Y. Nov. 30, 2012).............41

*Capaci v. Katz & Besthoff, Inc.*,
   711 F.2d 647 (5th Cir. 1983) ...................................................................... 25, 26

*E.E.O.C. v. Andrew Corp.*,
   No. 81 C 4359, 1989 WL 32884 (N.D. Ill. Apr. 3, 1989)............................ 25, 27

*Fisher v. Mermaid Manor Home for Adults, LLC*,
   192 F. Supp. 3d 323 (E.D.N.Y. 2016)................................................................41

*Grant v. Bethlehem Steel Corp.*,
   635 F.2d 1007 (2d Cir. 1980) ................................................................ 25, 26, 36

*Hernandez v. Off. of Comm'r of Baseball*,
   No. 18-CV-9035 (JPO), 2021 WL 1226499 (S.D.N.Y. Mar. 31, 2021)………..19

*International Brotherhood of Teamsters v. United States*,
   431 U.S. 324, 97 S. Ct. 1943, 52 L. Ed. 25 396 (1977) ................................ 23, 26

*Johnson v. Potter*,
   398 F. App'x 644 (2d Cir. 2010)………………………………………………..23

*Kaytor v. Elec. Boat Corp.*,
   609 F.3d 537 (2d Cir. 2010) .............................................................................42

*MacLennan v. Am. Airlines, Inc.*,
   440 F. Supp. 466 (E.D. Va. 1977)......................................................................36

*Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*,
   964 F.2d 106 (2d Cir. 1992) .............................................................................42

*Martin v. Coinmach Corp.*,
   No. 15-CV-8137 (AJN), 2016 WL 6996182 (S.D.N.Y. Nov. 29, 2016)...... 39, 40

*Ortiz-Del Valle v. Nat'l Basketball Ass'n*,
   42 F. Supp. 2d 334 (S.D.N.Y. 1999) ............................................................ 24, 29

*United States v. City of New York*,
   713 F. Supp. 2d 300 (S.D.N.Y. 2010) ........................................................... passim
*United States v. City of Yonkers*,
   609 F. Supp. 1281 (S.D.N.Y. 1984) ......................................................................26
*Victory v. Hewlett-Packard Co.*,
   34 F. Supp. 2d 809 (E.D.N.Y. 1999) .....................................................................24
*Waisome v. Port Auth. of New York & New Jersey*,
   948 F.2d 1370 (2d Cir. 1991) ........................................................... 25, 27, 30, 31
*Woodson v. Pfizer, Inc.*,
   34 F. App'x 490 (7th Cir. 2002) .................................................................. 31, 32

## JURISDICTIONAL STATEMENT

This is an appeal from a final order entered on March 31, 2021 in the United States District Court for the Southern District of New York (J. Oetken) (the "District Court") granting MLB's[1] motion for summary judgment on all of Plaintiff-Appellant Angel Hernandez's ("Mr. Hernandez") claims. The District Court asserted subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Judgment was entered on March 31, 2021. Mr. Hernandez then timely filed a Motion to Alter, Amend or Vacate the Court's March 31, 2021 Opinion and Order pursuant to Fed. R. Civ. P. 59 on April 28, 2021. That motion was denied by the District Court on January 20, 2022. Pursuant to Fed. R. App. P. 3 and 4, Mr. Hernandez timely filed his notice of appeal on February 18, 2022.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The District Court failed to follow existent precedent applicable to discrimination cases in which the pool of minority individuals eligible for promotion is too small to yield a statistically significant conclusion as to disparate impact. In such cases, the failure of the employer to promote or hire any minority employees – a situation sometimes referred to as the "inexorable zero" – is itself

---

[1] Defendants-Appellees The Office of the Commissioner of Baseball and Major League Baseball Blue, Inc. were referred to before the District Court and shall be referred to collectively herein as "MLB." It is undisputed that Mr. Hernandez's employer of record is Major League Baseball Blue, Inc., a Delaware corporation.

considered to be legally significant as a matter of law. Rather than following that line of reasoning as established by binding precedent, the District Court determined that, unless the proof of discrimination is statistically significant, disparate impact discrimination claims brought by an employee cannot survive summary judgment, even if the inexorable zero is present.

The key issues on appeal can be summarized as follows:

1. Does proof that an employer has promoted "zero or near zero minorities"—the "inexorable zero"—present sufficient evidence to allow a disparate impact discrimination claim to survive summary judgment and proceed to trial?

2. Must proof of disparate impact discrimination be statistically significant, even if the size of the employee applicant pools is too small to ever yield a statistically significant conclusion?

3. Did the District Court improperly assume the role of factfinder in granting summary judgment for MLB as to Mr. Hernandez's disparate treatment discrimination claim?

## STATEMENT OF THE CASE

## I. Factual Background

Mr. Hernandez is a Major League umpire and has been since 1993. Dkt. 52-

3, ¶ 2.[2]  His claims of unlawful discrimination arise from MLB's conduct regarding its treatment of both Mr. Hernandez and other minority umpires in selecting individuals for promotion to crew chief and selection for other assignments.[3]  As the evidence presented to the District Court (Hon. J. Paul Oetken) discussed below demonstrates, MLB has discriminated against Mr. Hernandez individually and has also instituted policies and practices that have had the effect of disparately impacting both Mr. Hernandez and other minority umpires.

A.    *Few Minority Candidates for Promotion & Zero Minority Crew Chiefs*

Particularly as to umpires, MLB's discriminatory past (and, indeed, its conduct up to and through the time periods pertinent to this case)[4] is especially

---

[2] All references to "Dkt. [#]" are references to documents that are part of the underlying record, with the number identified being the document number listed in the header of the filed document as it appears in the record.

[3] The evidence presented to the District Court included not only information about promotions to crew chief, but also selections to umpire in the World Series. The evidence of disparate treatment pertains to both types of assignments, but for purposes of brevity this brief will focus on MLB's disparate treatment of Mr. Hernandez in the promotion of crew chiefs.  As more fully discussed below, the evidence relating to the failure to select *any* minority umpires – the "inexorable zero" – relates specifically to promotions to crew chief.

[4] Mr. Hernandez acknowledged in the District Court (and again acknowledges here) that, in 2020 (three years *after* the filing of this lawsuit), MLB, for the first time, promoted an African-American umpire to the crew chief position and that MLB also promoted in 2020, for only the second time in its history, a Latino umpire to the crew chief position.  Significantly, any such promotions are outside the period relevant to this lawsuit and have no bearing on Mr. Hernandez's claims.  The facts recited herein are as of the filing of Mr. Hernandez's original complaint on July 3, 2017 unless otherwise stated.

glaring. Before the filing of this lawsuit, Major League Baseball had promoted only one minority umpire to the position of permanent crew chief in its 150-plus year history (Richie Garcia). Dkt. 141-2, Declaration of Angel Hernandez, at ¶ 2; Dkt. 141-3, Excerpts of Deposition of Randy Marsh ("Marsh Dep."), 35:17-36:5.[5] Furthermore, the only umpire who became a permanent crew chief prior to the 2017 season and who was not born in the United States was Jim McKeon, a native of Canada. Dkt. 141-4, Excerpts of Deposition of Matt McKendry ("McKendry Dep."), 201:23-202:6.[6]

This case involves MLB's failure to promote minority umpires – including Mr. Hernandez – to crew chief, as well as MLB's failure to select qualified minority umpires (including Mr. Hernandez) for World Series assignments. In that regard, it is important first to recognize that, in light of MLB's existing policies, few minority umpires even make it past AAA baseball to the major leagues. MLB internally acknowledged its lack of minority umpires and referred to that as its "diversity issue." Dkt. 156-3, Exhibit G, Def 015146. When asked to acknowledge that with the current process "Major League Baseball has no power whatsoever to increase the level of minorities until they get to AAA," Randy Marsh

---

[5] The unredacted copy of the excerpts of Mr. Marsh's deposition that appear in the record at Dkt. 141-3 can be found at Dkt. 142-3.

[6] The unredacted copy of the excerpts of Mr. McKendry's deposition that appear in the record at Dkt. 141-4 can be found at Dkt. 142-4.

– one of the top MLB umpiring officials at the time – answered as follows:

> Yes, but let me explain something. Having taught at umpire school, I know that every year, Harry Wendelstedt, sent, contacted, the athletic directors at many major colleges and schools that had – that was mostly African American students and sent brochures, everything, trying to get them to come to umpire school. The problem is, yeah, *they* want the job, **but they want to be in the big Leagues tomorrow, and they don't want to go through all of that.**

Marsh Dep., 100:17-101:8 (emphasis added). Thus, according to one of MLB's top umpiring officials, the root of MLB's umpire "diversity issue" was not MLB's attitude towards or treatment of minorities, nor was it MLB's troubling history regarding minority umpires. Instead, he asserted that MLB's umpire "diversity issue" was a result of African American youth purportedly not "want[ing] to go through all" that it takes to become a Major League umpire. The evidence in the record demonstrates that this type of attitude towards MLB's "diversity issue" permeated multiple aspects of its umpire department and the personnel therein during the time period at issue.

B.    *The Crew Chief Position*

1.    ***Factors supposedly considered when making crew chief promotions***

The factors considered for promotions to crew chief vary depending on who is being asked. In its sworn answers to Mr. Hernandez's interrogatories, MLB provided a non-exclusive list of numerous and largely objective factors that are purportedly considered by MLB in making crew chief promotion decisions. *See*

Dkt. 141-15; *see also* Mr. Hernandez's Statement of Material Facts ("SMF"), p. A-94[7], ¶ 26. Nevertheless, the testimony of Joe Torre ("Torre") and the testimony of Peter Woodfork ("Woodfork) – individuals with significant roles in implementing the promotion of umpires to crew chief – each differ substantially from MLB's interrogatory answers.

Torre is the individual at MLB who made the final decision on crew chief promotions. Dkt. 141-5, Excerpts of Deposition of Peter Woodfork ("Woodfork Dep."), 23:16-24.[8] Torre testified that an umpire's ability is not the most important aspect of an umpire's job, and that the most important aspect of that job is "[h]aving the skills to handle situations." Dkt. 141-12, Excerpts of Deposition of Joe Torre ("Torre Dep."), 82:10-19.[9] Woodfork testified that Torre "focuses on leadership." Woodfork Dep., 27:7-13. Woodfork also testified that "consistency," "accountability," and "experience" were other factors considered by Torre in making crew chief promotion decisions. *Id.* at 27:17-25. Additionally, the number of games in which an umpire serves as interim crew chief is "important" and "part of the decision-making" process for crew chief promotions. Torre Dep., 197:22-

---

[7] All references to pages identified as "A-[#]" are to pages of the Joint Appendix filed contemporaneously herewith.

[8] The unredacted copy of the excerpts of Mr. Woodfork's deposition that appear in the record at Dkt. 141-5 can be found at Dkt. 142-5.

[9] The unredacted copy of the excerpts of Mr. Torre's deposition that appear in the record at Dkt. 141-12 can be found at Dkt. 142-12.

199:7; *see also* Woodfork Dep., 136:24-139:22.  Torre testified that the duties of an interim crew chief were the same as the duties of a permanent crew chief.  Torre Dep., 37:15-18; *see also* Marsh Dep., 54:16-25, 218:8-18.  Yet, as the foregoing testimony demonstrates, many of the factors listed by MLB in their interrogatory answers were never mentioned by Woodfork or Torre in their depositions.

### 2.  *The actual crew chief promotion process, as implemented*

In his deposition, Woodfork described the crew chief promotion process as "fluid."  Woodfork Dep., 35:23-36:19; *see also* SMF, p. A-95, ¶ 31.  Despite numerous evaluations of each umpire's job performance gathered during the course of each season, in reality  Torre and Woodfork did not rely on—or even review—those evaluations when considering umpires for promotion to crew chief. *See*, *e.g.*, Woodfork Dep., 26:2-17.

Although both Mid-Year and Year-End Evaluations were available to Torre and Woodfork, Woodfork testified that he did not actually review those evaluations in connection with making crew chief promotion decisions.  Woodfork Dep., 31:24-32:25.  Woodfork instead relied on his memory, "feelings" or "understanding" of an umpire's performance.[10]  *Id.*; *see also id.* at 35:23-36:19.

---

[10] Woodfork himself admitted that, to know Mr. Hernandez's "performance as it relates to year by year," he would need to "look at his reviews." Woodfork Dep., 190:12-25.  Indeed, Woodfork testified that he could not "recall" or otherwise testified that he had no knowledge of rudimentary elements of Mr. Hernandez's performance, such as whether Mr. Hernandez "submits timely umpire reports,"

Though MLB began comparing crew chief candidates' performances after the filing of this lawsuit, no document produced by MLB indicates that such a process was used before this lawsuit was filed. *See* Dkt. 141-18; Dkt. 142-18; Woodfork Dep., 217:25-219:2.

## II.     The use (or lack of use) of performance evaluations when promoting

MLB provides evaluations to its umpires in three separate forms: (i) Umpire Evaluation Reports ("UERs" or "FEFs"), (ii) Mid-Year Reviews, and (iii) Year-End Reviews. UERs are completed by umpire supervisors or observers for each umpire regarding each of the games that the supervisors or observers actually observe. Marsh Dep., 158:4-6. Mid-Year Evaluations are cumulative evaluations that are done on a "rolling basis as games are still being played." McKendry Dep., 139:8-11. Both Torre and Marsh testified that there should not be any comments in the Mid-Year Evaluations that are not found in the UERs issued during that same time period. Marsh Dep., 46:7-11; Torre Dep., 34:10-21. Year-End evaluations are issued by MLB at the end of each season and are a result of "[s]upervisors aggregate[ing] all of the end of game reports an umpire has received through the season and assign[ing] an overall grade to each category." Marsh

---

whether he "stays in communication with the Office [of the Commissioner] when he's supposed to," or whether he "is one of the most physically fit umpires." Woodfork Dep., 198:12-200:11.

13

Dep., 89:19-90:8; *see also* Dkt. 156-3, Exhibit G, at DEF 015092.   Torre testified that both the Mid-Year Evaluations and the Year-End Evaluations "come from" the UERs.  Torre Dep., 132:15-24.

### III.    MLB's Diversity Policy and its impact (or lack thereof) on promotions

MLB has a diversity policy contained in its employee handbook (the "Diversity Policy").    *See* Dkt. 141-19.  While the Diversity Policy states that "Major League Baseball provides equal employment opportunities (EEO) to all employees for employment without regard to race, ancestry, [or] color . . ." (*id.* at DEF 026073) and further states that the diversity policy applies "to all applicants, employees, contractors, and interns, whether related to conduct engaged in by fellow employees, supervisors, directors, managers, contractors, interns, or someone not directly connected to Major League Baseball . . ." (*id.* at DEF 026075), the individuals in charge of crew chief promotion decisions had an alarming lack of knowledge of the Diversity Policy and its requirements.  For example, when asked whether there was a diversity policy "as it relates to the hiring and promotion of umpires," Torre stated that he did not "know how to answer that" question. Torre Dep., 21:22-22:21.  Torre further testified that while the Diversity Policy discussed above applies to him, "[i]t really doesn't influence [his] job." Torre Dep., 26:3-20.

**IV.    Mr. Hernandez's qualifications to serve as permanent crew chief**

Mr. Hernandez has consistently received praise from MLB regarding his performance as an MLB umpire.   In addition to the evaluations discussed below, Mr. Hernandez "comes to work every day" and has never had significant injury issues in his career that have caused him to miss substantial time on the field.   *See* Marsh Dep., 98:2-24; *see also* Torre Dep., 172:13-19.

From 2006-2009, Mr. Hernandez received 24 "Exceeds Standard" ratings in individual games.   *See* Dkt. 141-22.   During that same time frame, Mr. Hernandez received only one "Does Not Meet" rating, which was for an ejection in 2006.   *See id.* at Page 11 of 48.   For each year from 2006-2009, Mr. Hernandez received an "Exceeds Standard" rating for his accuracy calling balls and strikes as a home plate umpire.   *Id.* at Page 15 of 48 (2006), Page 27 of 48 (2007), Page 37 of 48 (2008), and Pages 47-48 of 48 (2009).

From 2011-2016, Mr. Hernandez received a total of 9 "Exceeds Standard" ratings in his UERs, including at least one "Exceeds Standard" rating in each of those years.   In that same time frame, Mr. Hernandez received two "Does Not Meet" ratings, but at least one of those "Does Not Meet" ratings was incorrectly given to Mr. Hernandez by MLB. *See* SMF, pp. A-102 – A-103, ¶¶ 61-63; Torre Dep., 64:20-66:20.

Though Mr. Hernandez consistently received "Exceeds Standard" ratings in his UERs, Mr. Hernandez's Year-End Evaluations for the 2011-2016 seasons are not nearly

as positive. While Mr. Hernandez received a total of nine "Exceeds Standard" ratings from 2011-2016, with at least one "Exceeds Standard" rating in each season during that time period, he received only four "Exceeds Standard" ratings on Year-End Evaluations for the 2011-2016 seasons. *See* Dkt. 141-26. MLB failed to give Mr. Hernandez any "Exceeds Standard" ratings for the 2013, 2014 or 2015 seasons, despite Mr. Hernandez receiving one "Exceeds Standard" rating in his 2013 UERs, three "Exceeds Standard" ratings in his 2014 UERs, and one "Exceeds Standard" rating in his 2015 UERs. *Id.* Thus, though Year-End Evaluations are supposed to reflect and "come from" the UERs given during that season (*see* Torre Dep., 34:10-21, 132:15-24; Marsh Dep., 46:7-11), that was plainly not the case with Mr. Hernandez's 2011-2016 Year End Evaluations.

As the above demonstrates, a review of Mr. Hernandez's Year-End Evaluations and his UERs for the years 2011-2016 reveals that MLB manipulated Mr. Hernandez's year-end evaluations in order to make his job performance appear worse than it actually was. Mr. Hernandez's Year-End Evaluations for the 2011-2016 seasons do not even come close to accurately summarizing Mr. Hernandez's actual performance in those seasons.

During that time frame, Mr. Hernandez only received one "Does Not Meet" rating on his Year-End Evaluations. *See* Dkt. 141-26 at Page 11 of 45. That "Does Not Meet" rating was for an isolated, off-field incident in which Mr. Hernandez got baseballs autographed at the request of a fellow umpire. *Id.* That "Does Not Meet" rating was

16

given by MLB despite MLB acknowledging that "[f]or the greater part of [that] season, [Mr. Hernandez] did a commendable job of operating within the guidelines laid out in the policies distributed to umpires." *Id.* This is an example of what Marsh identified in his deposition when he acknowledged that MLB can "take isolated incidents" from any umpire's performance and use it against that umpire. *See* Marsh Dep., 85:21-86:5.

## V.  Mr. Hernandez's actual experience as an <u>interim</u> crew chief

Furthermore, the number of games in which an umpire acts as interim crew chief is also among the factors to be considered by MLB when determining which umpires to promote to the crew chief position. *See, e.g.,* Torre Dep., 197:22-199:7; *see also* Woodfork Dep., 136:24-139:22. Mr. Hernandez served as an *interim* crew chief for parts of each of the 2011-2016 seasons. Dkt. 141-36, Excerpts of Deposition of Angel Hernandez ("Hernandez Dep."), 85:16-86:10. In fact, Mr. Hernandez served as *interim* crew chief for the vast majority of the 2012 season. *See* Dkt. 141-28. Indeed, the UERs submitted for the 2012 season heap substantial praise on Mr. Hernandez for his work in that capacity. *See generally id.* Torre agreed in his deposition that Mr. Hernandez "did a great job [in 2012] taking over Rapuano's crew and everything seemed to go well." Torre Dep., 210:10-19.

### A.  *MLB's promotion of white umpires to be permanent crew chiefs*

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

During the 2016 season, Mr. Hernandez, Alfonso Marquez and Kerwin Danley (all minorities) were the most senior "number two" umpires on MLB's staff. *See* Dkt. 52-6; Torre Dep., 201:4-202:5. Mr. Hernandez, Marquez and Danley were the *only* number two umpires on MLB's umpire staff in 2016 to work with crew chiefs with less seniority than them. Dkt. 52-6. Moreover, Mr. Hernandez and Kerwin Danley were the most senior umpires who applied for the crew chief positions for the 2017 season. *See* Dkt. 141-52 at Page 2 of 2.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

No contemporaneous documentation has been provided about MLB's reasoning for why umpires are promoted to crew chief and why other umpires are not, including as to MLB's promotion decisions in 2017 as identified above. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████. Those letters are created after the promotion decisions are made and contain after-the-fact rationales for not promoting those umpires. *Id.* MLB at times may have held a conference call to discuss crew chief candidates, but no minutes or other written notes reflecting those meetings were produced by MLB. *See, e.g.,* Dkt. 141-94. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

Thus, during the period 2011-2017 MLB continued its long-standing pattern of promoting <u>zero</u> minorities to the position of permanent crew chief. As discussed more

fully below, MLB seeks to explain away that outcome by asserting (i) that its policies and procedures did not result in any disparate impact on minorities that was statistically significant, and (ii) that, as a result, Mr. Hernandez's disparate impact discrimination claim is therefore not viable.

## VI.    Procedural Background

Mr. Hernandez first brought claims for disparate treatment discrimination against MLB on July 3, 2017 in the United States District Court for the Southern District of Ohio.  Dkt. 1.  Following the transfer of the case from the United States District Court for the Southern District of Ohio to the United States District Court for the Southern District of New York, Mr. Hernandez filed an amendment to his Complaint on November 27, 2019 to include claims for disparate impact discrimination against MLB.  A-71 – A-79.  Subsequently, Mr. Hernandez moved for partial summary judgment on his discrimination claims, requesting that the Court grant summary judgment for Mr. Hernandez and find that he had established *prima facie* cases as to both his disparate treatment and disparate impact claims.  *See*, *e.g.*, Dkt. 138, 139.  MLB filed a cross-motion for summary judgment, seeking summary judgment in its favor on all claims.  *See*, *e.g.*, Dkt. 164, 165.  The parties then each filed additional briefs that were both in support of their original motions and in opposition to the opposing parties' motions.  *See*, *e.g.*, Dkt. 186, 193.

Following the completion of the parties' summary judgment briefing, the

District Court granted in full MLB's cross-motion for summary judgment and denied as moot Mr. Hernandez's motion for partial summary judgment. *See* Summary Judgment Order, SPA-8 – SPA-33[11]; *Hernandez v. Off. of Comm'r of Baseball*, No. 18-CV-9035 (JPO), 2021 WL 1226499 (S.D.N.Y. Mar. 31, 2021).

Mr. Hernandez filed a timely Motion to Alter, Amend or Vacate the Court's March 31, 2021 Opinion and Order pursuant to Fed. R. Civ. P. 59 on April 28, 2021. Dkt. 199, 200. That motion was denied by the District Court on January 20, 2022. SPA-35 – SPA-39. This appeal followed pursuant to a Notice of Appeal timely filed on February 18, 2022. A-669 – A-671.

## SUMMARY OF ARGUMENT

The District Court's decision to grant summary judgment in favor of MLB, if it is allowed to stand, creates a loophole that employers can use to avoid liability for disparate impact discrimination: if an employer makes the employee pools small enough, there can never be actionable disparate impact discrimination in relation to the promotion policies and practices applied to those small employee pools. In rendering summary judgment for MLB and creating this loophole, the District Court also failed to give appropriate weight to evidence of MLB's disparate treatment of Mr. Hernandez, including evidence that MLB was manipulating performance

---

[11] All references to pages identified as "SPA-[#]" are to pages of the Special Appendix filed contemporaneously herewith.

evaluations of Mr. Hernandez and other minority umpires to make their performances look worse.

In its analysis of Mr. Hernandez's disparate impact claim, the District Court recognized that the pools of applicants for promotion to crew chief did not include enough minorities to make the failure to choose a minority applicant statistically significant. The following point is not disputed: unlawful disparate impact discrimination *can* be demonstrated (and often is demonstrated) through statistical analyses when the data sets are large enough to permit a statistically significant conclusion that the failure to hire or promote a minority candidate goes beyond the realm of mere chance.

One critically important issue to be addressed in this appeal is what factor(s) the courts should consider – in cases such as this – when the data sets are inherently too small to reach **any** statistically significant conclusions. The District Court agreed with MLB that, absent proof of statistically significant discrimination, a disparate impact claim fails. But that approach has the practical effect of restricting viable disparate impact claims solely to situations in which the pool of applicants and the number of open positions would *ever* permit proof of disparate impact through statistical means. That analysis treats the failure to promote any minorities – an "inexorable zero" of minority promotions – as just another number.

But zero is not "just another number," as the case law discussed herein makes

clear. When an employer hires few minorities and consistently fails to promote *any* of them, that is an independently sufficient basis to conclude that the policies and practices of the employer are disparately impacting minority applicants. An employer who promotes zero minorities cannot escape liability by asserting that its failure to promote any minorities is not – from a purely technical standpoint – "statistically significant." The promotion of zero minorities is itself legally significant, and it was therefore improper for the District Court to grant MLB summary judgment on Mr. Hernandez's disparate impact discrimination claim.

Moreover, and specifically as to Mr. Hernandez's disparate treatment discrimination claim, the District Court improperly assumed the role as factfinder instead of leaving that function to the jury. This too was improper and requires that the District Court's ruling on Mr. Hernandez's disparate treatment discrimination claim be reversed.

The District Court's grant of MLB's motion for summary judgment is reviewed *de novo* by this Court. *Johnson v. Potter*, 398 F. App'x 644, 645 (2d Cir. 2010) (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir.2008)).

## ARGUMENT

The District Court erred, both by granting summary judgment to MLB as to Mr. Hernandez's disparate impact claim and by granting summary judgment to MLB as to his disparate treatment claim. As to the disparate impact claim, the District

Court chose not to follow the line of cases recognizing the significance of the "inexorable zero." In addressing Mr. Hernandez's disparate treatment claim, the District Court acknowledged the existence of contradictory and/or unclear evidence on several material factual points discussed in the parties' respective summary judgment filings, but then improperly substituted its own assessment of those facts by granting summary judgment to MLB instead of allowing a jury to resolve any perceived disputes.

## I.     Disparate Impact Discrimination Can Be Established by Statistical Proof, But It Can Also Be Demonstrated by the Presence of the "Inexorable Zero"

The District Court granted summary judgment to MLB on Mr. Hernandez's disparate impact claim on two primary bases, neither of which have merit. First, the District Court failed to apply binding legal authority regarding the impact of the "inexorable zero," instead concluding that Mr. Hernandez's reliance on the inexorable zero is misplaced due to (rather than supported by) the relatively small sample sizes at issue and the resulting inability to draw statistically significant conclusions using traditional statistical analyses such as the Fisher's Exact Test. Second, the District Court found that Mr. Hernandez's proposed alternative practices would be insufficient to "eliminate the disparity at issue," despite Mr. Hernandez's evidence that replacing a single individual's subjective assessments of the applicants with an even-handed application of the objective job performance criteria identified

by MLB itself would support the promotion of Mr. Hernandez and other very experienced minority candidates.

      A.    *The Inexorable Zero*

The Supreme Court of the United States stated in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S. Ct. 1943, 52 L. Ed. 25 396 (1977), that, in that case, "fine tuning of the statistics could not have obscured the glaring absence of minority line drivers. As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came **not from a misuse of statistics** but from 'the inexorable zero.'" *Id.* at n.1 (emphasis added). Before the District Court decision in this case, courts in this Circuit—including in the Southern District of New York itself—had properly concluded that "zero is not just another number," and that "even in cases where there is a weak inference of an inexorable zero or scant evidence of other women who applied and were rejected, a court should consider that this lack of evidence may itself be attributable to the 'inexorable zero.'" *United States v. City of New York*, 713 F. Supp. 2d 300, 318 (S.D.N.Y. 2010) (citing *Ortiz-Del Valle v. Nat'l Basketball Ass'n,* 42 F. Supp. 2d 334, 337-338 (S.D.N.Y. 1999)). The United States District Court for the Eastern District of New York has similarly found that "evidence of the absence of a single minority employee being hired, labeled the 'inexorable zero,' would in and of itself support an inference of discrimination." *Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 823 (E.D.N.Y.

1999).

This Court has also recognized that the inexorable zero supports an inference of discrimination, holding that "[d]espite evidence of some weaknesses in statistics, where they disclose a glaring absence of minority representation in the jobs at issue, the burden on the employer increases since 'fine tuning' of the statistics will not **rebut an inference of discrimination derived not from a misuse of statistics but from the inexorable zero**." *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1015 (2d Cir. 1980) (emphasis added). The Fifth Circuit Court of Appeals and other courts across the country have likewise acknowledged the legal impact of the inexorable zero in discrimination cases. *See*, *e.g.*, *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 662 (5th Cir. 1983) (noting that "courts have been particularly dubious of attempts by employers to explain away 'the inexorable zero'"); *E.E.O.C. v. Andrew Corp.*, No. 81 C 4359, 1989 WL 32884, at *13 (N.D. Ill. Apr. 3, 1989).

**B.**   *Small Sample Sizes Render the Traditional Statistical Analysis Relied Upon by MLB Unreliable*

The District Court acknowledged the existence of some of these authorities in its Summary Judgment Order, but the District Court inverted the logic of those cases by concluding that the inexorable zero was "less compelling" because, in this case, "both the pool of umpires and the number of available promotions are small." Summary Judgment Order, SPA-29. Although reliance on statistically significant data is one way to establish an inference of discrimination (when the data sets are

26

large enough), such analysis is not reliable when the underlying sample sizes are small. Therefore, when such cases arise, the courts properly look to other evidence of discrimination, including the presence of the inexorable zero.

As stated in *Waisome v. Port Auth. of New York & New Jersey*, 948 F.2d 1370 (2d Cir. 1991), and as the District Court itself quoted in its Summary Judgment Order, "where statistics are based on a relatively small number of occurrences, the presence ***or absence*** of statistical significance is not a reliable indicator of disparate impact." *Id*. at 1379 (emphasis added). The *Waisome* court further stated that "[f]or smaller samples the value of the standard deviation rule drops off . . . and gives emphasis to Mark Twain's comment that there are 'lies, damned lies and statistics.'" *Id*.; *see also United States v. City of Yonkers*, 609 F. Supp. 1281, 1289 (S.D.N.Y. 1984) (citing *Bos. Chapter, N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017, 1019–21 (1st Cir. 1974)).

As the foregoing decisions of this Court and other courts demonstrate, in cases such as this where the traditional statistical analysis is premised on small sample sizes, the weight afforded to that statistical analysis should be minimal, if any. Instead, in the circumstances such as those presented here, the Court must look to other evidence that may support the disparate impact claim. *See*, *e.g.*, *City of Yonkers*, 609 F. Supp. at 1289. Moreover, statistical analyses such as those proffered by MLB and relied on by the District Court should not be relied on when the

inexorable zero is present, as it indisputably is here. *See*, *e.g.*, *International Brotherhood of Teamsters*, 431 U.S. at 324; *Grant*, 635 F.2d at 1015. *See also Capaci*, 711 F.2d at 662.

As a result of the small sample sizes at issue, the District Court should have found MLB's statistical analysis—premised on the "standard deviation" rule the Second Circuit determined in *Waisome* to be of little value in cases with small sample sizes—to "not be a reliable indicator of disparate impact." *Waisome*, 948 F.2d at 1379. The District Court also is required to look to other evidence supporting Mr. Hernandez's claims as a result of the unreliability of that statistical analysis. For example, the District Court needed to consider the historical presence of the inexorable zero—that is, the reality that (i) from 2000 through 2016, MLB did not promote a single minority umpire to crew chief, and (ii) that MLB's predecessors had only once in their entire history promoted a minority umpire to the position of crew chief.[12] The prior precedents strongly indicate that the District Court should have given the inexorable zero *more* weight, not less, due to the unreliability of

---

[12] Though the District Court points to that single crew chief as "relevant" to its summary judgment decision, a predecessor entity of MLB having only once promoted a minority umpire to crew chief during the prior 150 years is not enough to eliminate genuine disputes of material fact as to Mr. Hernandez's disparate impact discrimination claim based on failure to promote minorities. *See*, *e.g.*, *Andrew Corp.*, 1989 WL 32884 at *13 ("courts, when confronted with Title VII defendants who have employed or **promoted zero or near zero minorities** or women, have avoided permitting labor market and statistical analyses to obscure the discrimination inherent in the 'inexorable zero'") (emphasis added).

MLB's traditional statistical analysis of the small data sets. Granting summary judgment to MLB in this context was reversible error.

C. *Whether the Small Sample Size from 2011-2017 was a Result of MLB's Own Conduct*

The District Court also failed to assign appropriate significance to the fact that the small sample sizes relied on by MLB were themselves caused by MLB's own "diversity problem." As the District Court correctly found in its Summary Judgment Order, "[a]s MLB recognized internally, during the period at issue in this case it employed an **unfortunately low proportion** of minority umpires." Summary Judgment Order, SPA-29 (emphasis added). The District Court went on to determine that "[i]ronically, the case for the 'inexorable zero' in this non-promotion case might be stronger if MLB employed a greater number of minority umpires, or if the promotion pool were large enough to lend the 'inexorable zero' theory more weight." *Id*. The District Court even went so far as to state that "the fact that MLB promoted few minority umpires **flows from MLB's 'diversity problem'** ..." *Id*. at SPA-29 – SPA-30 (emphasis added). Despite these multiple acknowledgements by the District Court regarding the causal role MLB's "diversity problem" played in the small sample sizes underlying MLB's statistical analysis, the District Court ruled that Mr. Hernandez's "'inexorable zero' argument" was "inert" because of those small sample sizes. *Id*.

In light of the precedential legal authority recognizing the application of the

29

inexorable zero in circumstances such as those presented here, the District Court erred when it nullified that principle by declaring it "inert." Here, the decisions of Major League Baseball Blue, Inc. to promote zero minority applicants to crew chief is clear, but "even in cases where there is a weak inference of an inexorable zero or scant evidence of other women who applied and were rejected, **a court should consider that this lack of evidence may itself be attributable to the 'inexorable zero.'"** *City of New York*, 713 F. Supp. 2d at 318 (citing *Ortiz-Del Valle*, 42 F. Supp. 2d at 337-338) (emphasis added); *see also Brennan v. City of White Plains*, No. 97 CIV. 2709 (RWS), 1998 WL 75692, at *7 (S.D.N.Y. Feb. 20, 1998) ("It is conceivable that a workplace **might lack other protected class members precisely as a result of a discriminatory policy** followed by defendant") (emphasis added). In addition, the Summary Judgment Order does not recognize that MLB's role in its "unfortunately low proportion of minority umpires"—the primary cause of the sample size issue present during the period 2011-2017—was itself evidence of a discriminatory MLB policy. The District Court's failure to properly weigh MLB's own role in causing the small sample sizes supposedly fatal to Mr. Hernandez's disparate impact discrimination claim was also error that warrants reversal.

D. *The District Court's Ruling Creates Improper Incentives That Are Inconsistent with the Law and Policy of the Second Circuit*

If the District Court's Summary Judgment Order were a true reflection of the law in this Circuit, the resulting reality would be that, so long as an employer keeps

the relevant employee pools and the number of minority employees in those pools small enough, the employer could never be found liable for disparate impact discrimination regardless of its policies' impact on minorities. That is not the law in this Circuit, nor should it be.

MLB—an employer who (i) did not promote a single minority umpire to crew chief from 2000-2016, and (ii) has only promoted one minority umpire to crew chief in its entire history—must not be permitted to avoid the consequences of its discriminatory policies by relying upon traditional statistical analyses in this instance. As discussed above, both the factual circumstances before the Court and the applicable binding case law require that the Court look beyond the traditional statistical analyses that failed to provide a statistically significant result. *Waisome*, 948 F.2d at 1379 ("where statistics are based on a relatively small number of occurrences, the presence or absence of statistical significance is not a reliable indicator of disparate impact"). Instead, the case law required that the District Court turn to other evidence, including MLB's disparate treatment of Mr. Hernandez, its manipulation of Mr. Hernandez's Year-End Evaluations in order to manufacture a purportedly non-discriminatory justification for its failure to promote him, and the undeniable existence of the inexorable zero—after all, "zero is not just another number." *City of New York*, 713 F. Supp. 2d at 318.

Were the Court's Summary Judgment Order to stand, MLB's recognized

"diversity problem" would be permitted to continue unabated and other employers in this Circuit would be incentivized to structure their employee pools and promotion procedures in a similar manner, thereby avoiding the possibility of liability due to disparate impact discrimination.  The District Court committed clear legal error by departing from Second Circuit case law in the Summary Judgment Order.  That departure from Second Circuit principles is all the more improper because it rewards employers who employ fewer minorities with *de facto* immunity from any disparate impact claims.

  **E.** *The Law of This Circuit Does Not Support Granting MLB's Cross-Motion for Summary Judgment as to Mr. Hernandez's Disparate Impact Claim*

  In its Summary Judgment Order, the District Court cited to *Waisome*, 948 F.2d at 1370, for the proposition that "where statistics are based on a relatively small number of occurrences, the presence or absence of statistical significance is not a reliable indicator of disparate impact."  *See* Summary Judgment Order, SPA-28. Nevertheless, the District Court stated—immediately after that quotation of *Waisome*—that "while the inexorable zero may be compelling in the case of a larger employer who has hired or promoted no minority candidates, it is less compelling in the present context, where both the pool of umpires and the number of available promotions are small."  *Id*.  In so doing, the Court cited to *Woodson v. Pfizer, Inc.*, 34 F. App'x 490, 492 (7th Cir. 2002)*,* and *City of New York*, 713 F. Supp. 2d at 318.

But *Woodson* is a Seventh Circuit case, and the District Court's interpretation of *Woodson* is inconsistent with Second Circuit case law, including *Waisome*. Furthermore, *City of New York*—properly applied—is consistent with *Waisome* and other Second Circuit case law. The District Court erred by failing to follow the precedents in this Circuit and by its reliance instead on *dicta* from a decision by the Seventh Circuit.

First, the District Court cited to *Woodson* in support of the proposition that the inexorable zero is "less compelling . . . where both the pool of umpires and the number of available promotions are small," and also in support of the proposition that, as explicitly stated in the Summary Judgment Order, the inexorable zero "require[es] a 'statistically large enough workforce'. . . to be relevant." Summary Judgment Order, Dkt. 197, Page 22 of 26 (citing *Woodson*, 34 F. App'x at 492). But *Woodson*—in addition to being a Seventh Circuit case rather than a Second Circuit case—does not actually stand for either of those propositions.

In *Woodson*, the plaintiff argued the "flip side" of the "inexorable zero" by curiously asserting that because the employer hired all African-Americans, the employer somehow discriminated against African-Americans. The *Woodson* court, in finding that the plaintiff's argument was "simply illogical," noted in *dicta* that "[u]nder the 'inexorable zero' test, [the Seventh Circuit] held that when an employer with a statistically large enough workforce employs no African Americans, [the

33

court] can infer that the employer intentionally discriminates against African Americans in its hiring decisions." *Id*. The *Woodson* court did not find that the inexorable zero is rendered irrelevant where small sample sizes are at issue, nor did the decision in *Woodson* turn on anything related to statistics. Additionally, the *Woodson* plaintiff's "illogical" argument regarding the "flip side" of the inexorable zero could not be more dissimilar from Mr. Hernandez's claims here. In short, *Woodson*—which is not binding in this Circuit — is distinct from the instant case and does not provide a sufficient basis for finding that there are no genuine disputes of material fact as to Mr. Hernandez's disparate impact claim.

The District Court's reliance on *City of New York* would have been proper if the Court were citing it in support of Mr. Hernandez's position, but the District Court's citation to that case as if it required a statistically significant pool of applicants is misplaced. In fact, the *City of New York* case actually contradicts the District Court's conclusion. While the District Court is correct that the *City of New York* court stated "a court cannot help but be circumspect where a municipal department in the country's largest city repeatedly selects only applicants of one sex for job vacancies . . .," the *City of New York* decision did not turn on the employer being "the country's largest city." *City of New York*, 713 F. Supp. 2d at 317-318. Like MLB, the municipal department in *City of New York* had numerous job vacancies relating to other types of positions – but a much smaller pool of applicants

34

pertinent to the particular employment category at issue in that case (bridge painters). Accordingly, the District Court's analysis in the *City of New York* case was directed to the applicants for the specific employment category in question, rather than assessing the City's hiring patterns as a whole.

The actual analysis in *City of New York* unquestionably supports Mr. Hernandez's claims in this case. The applicable numbers for each of the discrete hiring decisions that were the basis of the *City of New York* plaintiff's claims were not based on "the country's largest city" as a whole, but were instead applicant pools that were similar to the numbers MLB and the District Court relied on at summary judgment:

- From 1997-2002, the *City of New York* employer engaged in a provisional hiring scheme and ultimately hired thirteen men as Bridge Painters, while not hiring a single woman to that position. *City of New York*, 713 F. Supp. 2d at 307.

- In 1997, the *City of New York* employer considered twenty-two male applicants and two female applicants for ten positions, interviewing seventeen of the male applicants and neither of the female applicants. *Id*. at 311-312.

- In 1999, the *City of New York* employer received fourteen applications (twelve men and two women), interviewing twelve of the male applicants and only one female applicant for nine positions, and hiring only two. *Id* at 312-313.

- In 2001, the *City of New York* employer received "resumes" from sixteen male applicants and one female applicant, interviewed eight male applicants and the one female applicant, and ultimately hired no

one. *Id*. at 314.

- In 2002, the *City of New York* employer "received approval to recruit five additional Bridge Painters," but did not interview or hire anyone due to budgetary constraints. *Id*.

Despite the relatively small samples sizes, the *City of New York* court went out of its way to state that the "case was litigated **without resort to statistical evidence** other than the elephant in the room—the incontrovertible fact that [the employer] has never hired a provisional female Bridge Painter." *Id*. at 317 (emphasis added). Just as Mr. Hernandez has done in this case, the plaintiffs in *City of New York* did not attempt to provide statistical evidence in support of their claims when the applicant pools were too small to permit a statistically significant conclusion. But, in *City of New York*, the court drew the proper conclusion that, even though the applicant pools were too small to permit any statistically significant conclusions, the "inexorable zero" was "still relevant." *Id*. at 317-318. The *City of New York* court therefore properly relied on the presence of the inexorable zero in finding for the plaintiff despite (i) the small sample sizes at issue, and (ii) the absence of traditional statistical analysis.

At least in this Circuit, a plaintiff who litigates a disparate impact claim in the context of small applicant pools "without resort to statistical evidence" is not wasting his or her time. As a matter of law in this Circuit, small applicant pools that by their very nature do not permit statistically significant conclusions do not bar the

plaintiff's claim. On the contrary, when that situation presents itself in the analytical decision tree, the District Court – like the court in the *City of New York* case – should have permitted the plaintiff to rely on other evidence, including the inexorable zero, instead.

By determining that the absence of statistical evidence is fatal to Mr. Hernandez's disparate impact discrimination claim, and by refusing to permit Mr. Hernandez to proceed to trial on that claim in reliance on the inexorable zero and other evidence in the record, the District Court chose not to follow the binding legal authority from the Supreme Court of the United States, the Second Circuit, and the Southern District of New York itself. Those errors constitute independently sufficient bases for reversal.

<blockquote>F.    <u>MLB Failed to Prove Job-Relatedness/Business Necessity</u></blockquote>

MLB's cross-motion for summary judgment should likewise have been denied on the independently sufficient basis that MLB failed to meet its burden of "proving job-relatedness to rebut a claim of disparate impact." *Grant*, 635 F.2d at 1015. MLB's burden of proving job-relatedness/business necessity is high in this situation, where, as discussed above, the inexorable zero is present. Moreover, even if the inexorable zero was not present here and MLB's burden were not heightened, "merely asserting a business necessity rationale does not suffice to prove the defense." *Banks v. City of Albany*, 953 F. Supp. 28, 36 (N.D.N.Y. 1997); *see also*

*MacLennan v. Am. Airlines, Inc.*, 440 F. Supp. 466, 472 (E.D. Va. 1977) ("[t]he incantation of a safety rationale is not an abracadabra to which this Court must defer judgment. The defendant must prove that the policy is reasonably necessary, not merely that it is 'reasonable,' as the defendant apparently contends"). "An employer's subjective belief that a practice is necessary, **without any supporting evidence**, is insufficient to justify a discriminatory practice." *Banks*, 953 F. Supp. at 36 (emphasis added). In some cases, "[i]n order to establish a business necessity defense, employers have been required to present convincing expert testimony demonstrating that a challenged practice is in fact required to achieve the desired goal." *Id.* (internal citations omitted).

In its summary judgment briefing, MLB wholly failed to meet its burden of proving the business necessity of the promotion practices identified by Mr. Hernandez. MLB's business necessity defense amounted to nothing more than blanket assertions that its "consideration of leadership ability and situation management for umpires to serve in leadership positions and work the highest profile games is eminently reasonable and fully comports with business necessity." Dkt. 173, Page 57 of 61. In making such conclusory assertions, MLB does not cite to **any** evidence, let alone evidence that amounts to "convincing expert testimony," as is sometimes required in disparate impact discrimination cases. *Banks*, 953 F. Supp. at 36.

MLB's failure to do so should have resulted in the denial of its cross-motion for summary judgment on Mr. Hernandez's disparate impact claim. Yet, not only did the District Court grant MLB summary judgment on the issue of business necessity, it did so with little explanation—the only mention of that burden by the District Court in its Summary Judgment Order is by stating "even assuming, *arguendo*, . . . that MLB demonstrated the business necessity of its promotion practices . . ." Dkt. 197, Page 23 of 26. An *arguendo* assumption cannot properly form the basis for a grant of summary judgment. The District Court was required to engage in a detailed consideration of this prong of the analysis and, given the absence of actual proof of business necessity, the District Court should have denied MLB's request for summary judgment. The District Court's failure to do so is yet another independently sufficient reason why MLB should not have been granted summary judgment.

G. *Mr. Hernandez's Proposed Alternative Practices Were Sufficient to Create Genuine Disputes of Material Fact*

The District Court likewise erred in finding summary judgment for MLB was appropriate as to Mr. Hernandez's proposed alternative practices. Though the District Court stated that Mr. Hernandez "understandably critiques the promotion processes for being overly subjective," the "overly subjective" nature of the promotion processes was not the sole basis of Mr. Hernandez's disparate impact claim. Instead, Mr. Hernandez's disparate impact claim was premised on the reality

(i) that the promotion processes were based only on a single individual's (Torre) subjective judgment of subjective criteria, and (ii) that Torre, in singularly making those decisions, ignored the wealth of **objective** information MLB collects regarding umpire performance.

The impermissible characteristics of the actual MLB policy that underlie Mr. Hernandez's disparate impact claim therefore go far beyond a mere complaint that MLB's promotion policies were "subjective," and also include MLB's vesting of power to make those subjective decisions in a single non-minority individual. Courts in the Second Circuit have found that entrusting power to make subjective promotion decisions solely to a non-minority individual (as is the case here) is an employer policy upon which a disparate impact claim can be based. *See*, *e.g.*, *Banks*, 953 F. Supp. at 36; *Martin v. Coinmach Corp.*, No. 15-CV-8137 (AJN)(SN), 2016 WL 6996182, at *6 (S.D.N.Y. Nov. 29, 2016).

Mr. Hernandez's proposed alternative practices were (i) "view[ing] the entire body of an umpire's work as opposed to focusing solely on the subjective criteria" identified by MLB, and (ii) requiring the entire umpire department to collaborate for promotion decisions as opposed to leaving those decisions to Torre alone. Each of those proposed alternative practices eliminates the problems inherent in MLB's current policies by requiring MLB to focus on more objective data and by taking full authority over promotion decisions out of the hands of a single non-minority

individual (Torre) and putting that authority instead into the hands of a larger group.

Rather than actually provide any evidence as to why such alternative practices would not work, MLB instead simply insisted that the District Court not "second-guess" their preferred (discriminatory) policy. *See*, *e.g.*, Dkt. 193, page 32 of 33. The complete lack of evidence to support any assertion on the part of MLB that Mr. Hernandez's proposed alternative practices would not actually work highlights the genuine disputes of material fact that are present. A jury, as the factfinder, should be permitted to make its own determination as to whether such alternative practices would be sufficient in this instance. The District Court's Summary Judgment Order precluded the jury from being able to make that determination and should therefore be reversed on that independently sufficient basis as well.

The District Court's decision to grant summary judgment for MLB was also inappropriate because Mr. Hernandez's proposed alternative practices would eliminate not only the subjectivity inherent in MLB's promotion practices, but also eliminate MLB's reliance on a single, non-minority decisionmaker in making promotion decisions. Mr. Hernandez challenges not only the subjectivity of MLB's practices, but also MLB's process in which promotion decisions were made only by one non-minority individual (Torre). See Dkt. 200, Pages 18-19 of 23. By MLB's own assertion, it was Torre—and Torre alone—who was responsible for the promotion decisions. Reliance on a single non-minority decisionmaker in making

subjective promotion decisions constitutes a cognizable basis for a disparate impact discrimination claim. *Martin v. Coinmach Corp*., No. 15-CV-8137 (AJN)(SN), 2016 WL 6996182, at *6 (S.D.N.Y. Nov. 29, 2016); *see also Banks*, 953 F. Supp. at 36. The District Court therefore also committed reversible error by considering only the subjectivity of MLB's promotion policies in its analysis of Mr. Hernandez's proposed alternative practices and by failing to conclude that entrusting the promotion decisions to a single non-minority individual constituted sufficient proof of disparate impact discrimination to take the case to a jury.

## II. The District Court Improperly Assumed the Role of Factfinder

In addition to the legal errors discussed above, the District Court improperly assumed the role of factfinder. At the summary judgment stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this [c]ourt will construe the facts in the light most favorable to the non-moving party and must resolves all ambiguities and draw all reasonable inferences against the movant." *Fisher v. Mermaid Manor Home for Adults, LLC*, 192 F. Supp. 3d 323, 327 (E.D.N.Y. 2016); *see also Caban v. City of New York*, No. 11 CIV. 3417 SAS, 2012 WL 5992088, at *2 (S.D.N.Y. Nov. 30, 2012). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Caban,* 2012 WL 5992088 at *2 (internal

citations and quotations omitted). "Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit . . . for the court in considering such a motion *must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (emphasis in original, internal quotations and citations omitted). Moreover, in this Circuit "summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the verdict . . .' *i.e.*, 'it is quite clear what the truth is.'" *Id*. at 546.

Furthermore, special considerations apply to summary judgment motions in the context of employment discrimination cases such as the one at bar. As the District Court itself identified in its Summary Judgment Order, "[t]he Second Circuit has 'repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" Summary Judgment Order, Dkt. 197, SPA-17; *see also Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 113 (2d Cir. 1992) (identifying "the familiar rule that summary judgment is 'ordinarily inappropriate where [as here] intent and state of mind are at issue'") (internal citations omitted).

Nevertheless, the District Court granted MLB's summary judgment motion in

its entirety and, in so doing, improperly engaged in "jury functions" such as making

credibility determinations, weighing the evidence, and drawing inferences from the

facts. Examples of the District Court engaging in these functions include, but are

not necessarily limited to:

- Despite noting that "[t]he record is not entirely clear regarding how MLB develops mid- and end-season evaluations," finding that there was no genuine dispute of material fact as to Mr. Hernandez's claims and arguments based on those evaluations and MLB's treatment of same. *See*, *e.g.*, Summary Judgment Order, Dkt. 197, SPA-10.

- Determining that, despite (i) the Court's acknowledgement of the lack of clarity in the record regarding (among other things) the factors considered by MLB in making crew chief promotion decisions and (ii) the differences in the proof offered by the respective parties regarding what factors actually apply to making crew chief promotion decisions, a juror could not have found Mr. Hernandez was "significantly better qualified for the job" than the individuals promoted to crew chief over him. *See id*. at SPA-18 – SPA-19.

- Holding that, despite the District Court's own observation that "the record is not transparent about the weight Torre affords the criteria he uses in promotion decisions," there is not a genuine dispute of material fact on pretext. *Id*.

- Concluding that MLB's "slightly different explanations" for the factors they consider in making promotion decisions "are not genuinely inconsistent, but are a reflection of the subjective and multi-faceted nature of this determination." *Id*. at SPA-19 – SPA-20.

- Finding that, while there is evidence that Mr. Hernandez's "FEFs" (also referred to below as "UERs") are not accurately reflected in his Year-End Evaluations and that "there is some uncertainty in the record as to the relationship between FEFs and umpire evaluations," a genuine dispute of material fact on the issue of pretext of

discrimination is not present. *Id*. at SPA-20 – SPA-21.

- Making credibility determinations by accepting at face value MLB's proffered explanation for not promoting Mr. Hernandez to the crew chief position, for which Mr. Hernandez has presented evidence in the record that MLB's explanation is pretextual. *See*, *e.g.*, *id*. at SPA-25("[t]he explicit reason MLB offers—that **according to Torre**, Hernandez 'has not demonstrated the leadership ability and situation-management skills in critical, high-pressure roles on a consistent basis . . . .'") (emphasis added).

- Engaging in a step-by-step analysis of what the District Court contends the jury must factually conclude regarding Mr. Hernandez's disparate treatment claim before ultimately determining no reasonable juror could make those conclusions. *Id*. at SPA-25 – SPA-26.

Rather than leaving these fact-finding functions to the jury, the District Court improperly weighed the evidence itself, made credibility determinations as to MLB's asserted explanations, and drew inferences from facts despite simultaneously acknowledging the genuine disputes (and lack of clarity in the evidentiary record) surrounding those material facts. In so doing, the District Court committed reversible error.

## **CONCLUSION**

Prohibited discrimination is not limited to large employers. The District Court erred (i) by failing to conclude that the promotion of zero minorities constitutes reliable evidence of disparate impact discrimination, (ii) by requiring proof that the disparate impact discrimination alleged by Angel Hernandez be statistically significant, and (iii) by assuming the role of fact finder in relation to the proof offered

by Mr. Hernandez in support of his claims. If the statutory prohibitions against disparate impact discrimination are to continue to have any practical effect in the context of smaller employers, the summary judgment granted by the District Court in this case must be reversed.

Dated: June 1, 2022

Respectfully submitted,

*/s/ Nicholas R. Gregg*
Nicholas R. Gregg
Murphy Landen Jones PLLC
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
Tel: (859) 360-1123
NGregg@MLJfirm.com

Nicholas J. Zaita
PECKAR & ABRAMSON, P.C.
70 Grand Avenue, Suite 200
River Edge, NJ 07661
Tel: (201) 343-3434
NZaita@pecklaw.com

*Attorneys for Plaintiff-Appellant*
*Angel Hernandez*

## **CERTIFICATE OF COMPLIANCE**

I, Nicholas R. Gregg, counsel for Plaintiff-Appellant Angel Hernandez, hereby certify that the foregoing brief complies with the type-volume limitations set forth in Second Circuit Local Rule 32.1(a)(4)(A) because it contains 9,945 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point font.

*/s/ Nicholas R. Gregg*
Nicholas R. Gregg