# 22-0343-cv

# United States Court of Appeals
### *for the*
# Second Circuit

———————

ANGEL HERNANDEZ,

*Plaintiff-Appellant,*

— v. —

THE OFFICE OF THE COMMISSIONER OF BASEBALL
and MAJOR LEAGUE BASEBALL BLUE, INC.,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

NEIL H. ABRAMSON
ADAM M. LUPION
RACHEL S. PHILION
RACHEL S. FISCHER
PROSKAUER ROSE LLP
*Attorneys for Defendants-Appellees*
11 Times Square
New York, New York 10036
(212) 969-3000

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure Rule 26.1(a), Defendants-Appellees The Office of the Commissioner of Baseball, which does business as Major League Baseball, and Major League Baseball Blue, Inc. state that The Office of the Commissioner of Baseball is an unincorporated association. As such, it has no corporate parent, and no publicly held corporation owns 10% or more of it. Major League Baseball Blue, Inc. is a Delaware corporation wholly owned by The Office of the Commissioner of Baseball.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR
    REVIEW ...........................................................................................1

COUNTERSTATEMENT OF THE CASE ...........................................2

    A.    Factual Background ...........................................................2

        1.    The Role Of Major League Umpires And Crew Chiefs ............2

        2.    Hernandez's Deficient Performance In Areas Torre
            Considered Most Important For Permanent Crew
            Chiefs And World Series Assignments ......................................5

            i.    Hernandez's Lack Of Accountability And
                  Inability To Move Past His Mistakes Are
                  Qualities The MLB Decision-maker Deemed
                  Inconsistent With On-Field Leadership ...........................8

            ii.    Hernandez Was Unable To Successfully Handle
                  Difficult On-Field Situations With A Calm And
                  Professional Demeanor On A Consistent Basis .............11

            iii    Hernandez Struggled As An Interim Crew Chief
                  In Multiple Seasons .......................................................13

        3.    The Undisputed Expert Evidence Established That
            There Was No Disparity In MLB's Selection Rates
            Between White And Non-White Umpires For Crew
            Chief Or World Series Positions ...............................................17

    B.    Proceedings Below .......................................................................18

SUMMARY OF THE ARGUMENT ....................................................21

STANDARD OF REVIEW ...................................................................24

ARGUMENT .........................................................................................26

    I.    THE DISTRICT COURT CORRECTLY GRANTED
        SUMMARY JUDGMENT ON HERNANDEZ'S
        DISPARATE TREATMENT CLAIMS ...............................................26

A.      Legal Standard .........................................................26

B.      The District Court Did Not Assume The Role Of The
        Jury In Holding That Hernandez Failed To Raise A
        Triable Issue Of Material Fact ...............................29

II.     THE DISTRICT COURT PROPERLY DISMISSED
        HERNANDEZ'S DISPARATE IMPACT CLAIMS
        BECAUSE HERNANDEZ FAILED TO RAISE A TRIABLE
        ISSUE OF FACT ON ANY OF THE REQUIRED
        ELEMENTS .................................................................33

A.      Legal Standard .........................................................34

B.      Hernandez Failed to Identify a Policy or Practice ....35

C.      Hernandez Failed To Present Evidence Of A
        Statistically Significant Disparity ...........................37

        1.      A Statistically Significant Disparity Requires
                Statistical Proof...............................................37

        2.      The "Inexorable Zero" Theory Is Not A
                Substitute For The Required Statistical Proof
                And Does Not Establish A Statistically
                Significant Disparity.......................................39

        3.      A Statistical Showing Remains A Requirement
                When Sample Sizes Are Small .......................45

        4.      The Undisputed Statistical Evidence Confirms
                That There Was No Statistically Significant
                Disparity In This Case ....................................48

        5.      Hernandez Cannot Establish A Disparate Impact
                By Alleging Intentional Discrimination .........50

D.      Hernandez Failed To Show A Causal Connection ....51

E.      MLB's Reliance On Subjective Qualities Is Consistent
        With Business Necessity............................................52

F.      Hernandez Failed To Present Evidence Of An
        Alternate Practice That Would Adequately Serve
        MLB's Legitimate Business Needs ...........................55

CONCLUSION ......................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
  239 F.3d 456 (2d Cir. 2001) ...............................................................25

*Albemarle Paper Co. v. Moody*,
  422 U.S. 405 (1975) ...........................................................................35

*Aulicino v. N.Y.C. Dep't of Homeless Servs.*,
  580 F.3d 73 (2d Cir. 2009) ...................................................... 26, 27, 32

*Banks v. City of Albany*,
  953 F. Supp. 28 (N.D.N.Y. 1997) ............................................... 36, 54

*Brennan v. City of White Plains*,
  No. 97-cv-2709 (RWS), 1998 WL 75692 (S.D.N.Y. Feb. 20, 1998) .......... 41, 51

*Bridgeport Guardians, Inc. v. City of Bridgeport*,
  735 F. Supp. 1126 (D. Conn. 1990) ...................................................49

*Brown v. Coach Stores, Inc.*,
  163 F.3d 706 (2d Cir. 1998) ....................................................... 26, 40

*Burwell v. E. Air Lines*, *Inc.*,
  633 F.2d 361 (4th Cir. 1980) ..............................................................54

*Byrd v. Philadelphia Gas Works*,
  No. 19-cv-5305 (MMB), 2021 WL 5867881 (E.D. Pa. Dec. 10, 2021) ..............53

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
  243 F.3d 93 (2d Cir. 2001) ........................................................ 28, 31, 36

*Campbell v. Nat'l Fuel Gas Distrib. Corp.*,
  723 F. App'x 74 (2d Cir. 2018).........................................................28

*Capaci v. Katz & Besthoff, Inc.*,
  711 F.2d 647 (5th Cir. 1983) ..............................................................41

*Capruso v. Hartford Fin. Servs. Grp., Inc*,
  No. 01-cv-4250 (RLC), 2003 WL 1872653 (S.D.N.Y. Apr. 10, 2003) ..............43

*Castaneda v. Partida*,
  430 U.S. 482 (1977) ...........................................................................49

*Davis v. Cintas Corp.*,
    717 F.3d 476 (6th Cir. 2013) ................................................................36

*Deabes v. Gen. Nutrition Corp.*,
    415 F. App'x 334 (2d Cir. 2011) .........................................................31

*Deleon v. Putnam Valley Bd. of Educ.*,
    No. 03-cv-10274 (CM), 2006 WL 236744 (S.D.N.Y. Jan. 26, 2006) ...............43

*Desir v. City of N.Y.*,
    453 F. App'x 30 (2d Cir. 2011) ...........................................................25

*Dister v. Cont'l Grp., Inc.*,
    859 F.2d 1108 (2d Cir. 1988) .............................................................31

*E.E.O.C. v. Andrew Corp.*,
    No. 81-cv-4359 (EEB), 1989 WL 32884 (N.D. Ill. Apr. 3, 1989) ......................45

*EEOC v. Joe's Stone Crab, Inc.*,
    220 F.3d 1263 (11th Cir. 2000) ...........................................................43

*Fleming v. MaxMara USA, Inc.*,
    371 F. App'x 115 (2d Cir. 2010) .........................................................28

*Furnco Constr. Corp v. Waters*,
    438 U.S. 567 (1978) .........................................................................55

*Gachette v. Metro-North Commuter R.R. Co.*,
    804 F. App'x 65 (2d Cir. 2020) ...........................................................27

*Gilty v. Vill. of Oak Park*,
    919 F.2d 1247 (7th Cir. 1990) ............................................................43

*Grant v. Bethlehem Steel Corp.*,
    635 F.2d 1007 (2d Cir. 1980) ...................................................... 43, 44

*Green v. City of Philadelphia*,
    No. 21-1034, 2022 WL 1165644 (3d Cir. Apr. 20, 2022) ...................................38

*Griggs v. Dukes Power Co.*,
    401 U.S. 424 (1971) .........................................................................37

*Gulino v. N.Y. State Educ. Dep't*,
    460 F.3d 361 (2d Cir. 2006) ...................................................... 34, 38, 52

*Harris v. Dep't of Child. & Families*,
    No. 21-11581, 2022 WL 247982 (11th Cir. Jan. 27, 2022) ...................................38

*Harriss v. Pan Am. World Airways, Inc.*,
   649 F.2d 670 (9th Cir. 1980) ................................................................54

*Hicks v. Baines*,
   593 F.3d 159 (2d Cir. 2010) ................................................................25

*International Brotherhood of Teamsters v. United States*,
   431 U.S. 324 (1977) ...........................................................................41

*Isaac v. City of N.Y.*,
   701 F. Supp. 2d 477 (S.D.N.Y. 2010) ...............................................28

*James v. N.Y. Racing Ass'n*,
   233 F.3d 149 (2d Cir. 2000) ................................................................27

*Johnson v. N.Y.C. Dep't of Educ.*,
   633 F. App'x 42 (2d Cir. 2016) ..........................................................26

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) ................................................................19

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
   731 F.3d 199 (2d Cir. 2013) ................................................................18

*Levin v. Delta Air Lines, Inc.*,
   730 F.2d 994 (5th Cir. 1984) ..............................................................55

*M.O.C.H.A. Soc'y Inc. v. City of Buffalo*,
   689 F.3d 263 (2d Cir. 2012) ........................................................ 38, 55

*Mandala v. NTT Data, Inc.*,
   975 F.3d 202 (2d Cir. 2020) ........................................................ 34, 35

*Martin v. Coinmach Corp.*,
   No. 15-cv-8137 (AJN) (SN), 2016 WL 6996182 (S.D.N.Y. Nov. 29, 2016) ......36

*Martinez v. Conn. Dep't of Corr.*,
   125 F. Supp. 3d 397 (D. Conn. 2015) ................................................45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...........................................................................25

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ...........................................................................27

*McEvoy v. Fairfield Univ.*,
   844 F. App'x 420 (2d Cir. 2021) ........................................................31

*Meiri v. Dacon*,
759 F.2d 989 (2d Cir. 1985) .............................................................28

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102 (2d Cir. 2013) ...........................................................27

*Montgomery v. N.Y.C. Transit Auth.*,
806 F. App'x 27 (2d Cir. 2020)........................................................24

*Nguedi v. Fed. Reserve Bank of N.Y.*,
813 F. App'x 616 (2d Cir. 2020)......................................................25

*O'Leary v. N.Y. State Unified Court Sys.*,
No. 05-cv-6722 (HB), 2007 WL 2244483 (S.D.N.Y. Aug. 6, 2007)..................53

*Okeke v. Adm'rs of Tulane Educ. Fund*,
No. 21-30451, 2022 WL 1025991 n.7 (5th Cir. Apr. 6, 2022) ...........................36

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
875 F.2d 365 (2d Cir. 1989) ...........................................................49

*Pierre v. City of N.Y.*,
844 F. App'x 411 (2d Cir. 2021) ......................................................25

*Ricci v. DeStefano*,
557 U.S. 557 (2009) .......................................................................37

*Ries v. Winona Cnty.*, 10-cv-1715 (JNE) (JJK), 2011 WL 2200622
(D. Minn. May 6, 2011), *report & recommendation adopted*,
2011 WL 2173698 (D. Minn. Jun.1, 2011) .........................................49

*Rightnour v. Tiffany & Co.*,
354 F. Supp. 3d 511 (S.D.N.Y. 2019) ...............................................27

*Robinson v. Metro-North Commuter R.R. Co.*,
267 F.3d 147 (2d Cir. 2001) ...................................................... 38, 40

*Shaikh v. Nat'l Bank of Pakistan*,
847 F. App'x 45 (2d. Cir. 2021).......................................................25

*Shands v. Lakeland Cent. Sch. Dist.*,
No. 15-cv-4260 (KMK), 2018 WL 3315738 (S.D.N.Y. July 5, 2018) ...............29

*Smith v. City of Jackson, Miss.*,
544 U.S. 228 (2005) .......................................................................35

*Sotomayor v. City of N.Y.*,
   713 F.3d 163 (2d Cir. 2013) ........................................................ 25, 51

*Stackhouse v. Pa. State Police*,
   No. 01-cv-223 (CCC), 2005 WL 8167743 (M.D. Pa. Oct. 4, 2005)...................49

*Sullivan v. Standard Chlorine of Del., Inc.*,
   845 F. Supp. 167 (D. Del. 1994) ........................................................53

*Teasdale v. City of N.Y.*,
   No. 08-cv-1684 (KAM), 2013 WL 5300699 (E.D.N.Y. Sept. 18, 2013) ..... 45, 46

*Teasdale v. N.Y.C. Fire Dep't, FDNY*,
   574 F. App'x 50 (2d Cir. 2014)........................................................46

*United States v. City of New York*,
   713 F. Supp. 2d 300 (S.D.N.Y. 2010) ........................................... 41, 51

*United States v. City of Yonkers*,
   609 F. Supp. 1281 (S.D.N.Y. 1984) ....................................................48

*Victory v. Hewlett-Packard Co.*,
   34 F. Supp. 2d 809 (E.D.N.Y. 1999)....................................................44

*Waisome v. Port Authority of New York & New Jersey*,
   948 F.2d 1370 (2d Cir. 1991) ..................................................... 46, 47

*Wards Cove Packing Co., Inc. v. Atonio*,
   490 U.S. 642 (1989) ............................................................... 35, 40

*Watson v. Fort Worth Bank & Trust*,
   487 U.S. 977 (1988) ....................................................... 35, 37, 53, 55

*Weinstock v. Columbia Univ.*,
   224 F.3d 33 (2d Cir. 2000) ..............................................................25

*Wharff v. State Univ. of N.Y.*,
   413 F. App'x 406 (2d Cir. 2011)........................................................34

*Wood v. N.Y.C. Transit Auth.*,
   699 F. App'x 76 (2d Cir. 2017)........................................................28

*Woodson v. Pfizer, Inc.*,
   34 F. App'x 490 (7th Cir. 2002)........................................................47

*Ya-Chen Chen v. City Univ. of N.Y.*,
   805 F.3d 59 (2d Cir. 2015) ..............................................................26

*Zahorik v. Cornell Univ.*,
  729 F.2d 85 (2d Cir. 1984) ............................................................ 54, 56

**Statutes:**

42 U.S.C. § 1981 ........................................................... 1, 18, 19, 26

42 U.S.C. § 2000e *et seq.* ("Title VII") ........................................ passim

42 U.S.C. § 2000e-2(k)(1)(A)(i) ............................................ 34, 38, 52

N.Y. Exec. L § 296 ("New York State Human Rights Law")....................... passim

N.Y.C. Admin. Code § 8-101 ("New York City Human Rights Law").......... passim

N.Y.C. Admin. Code § 8-107(17)(a) ....................................................34

**Other Authorities:**

29 C.F.R. § 1607.4(D) .....................................................................4

*Employment Tests and Selection Procedures*, EEOC Fact Sheet EEOC-
NVTA-2007-2 (Dec. 1, 2007)............................................................39

*Section 15 - Race and Color Discrimination*, EEOC Compliance Manual,
EEOC-CVG-2006-1, (Apr. 19, 2006)....................................................39

## <u>COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.      Did the District Court correctly grant the employer summary judgment on the employee's disparate treatment discrimination claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law (N.Y. Exec. L § 296) ("NYSHRL") and the New York City Human Rights Law (N.Y. City Admin. Code § 8-101 *et seq.*) ("NYCHRL") when the employee affirmatively pled a nondiscriminatory motive and otherwise failed to proffer any evidence from which a jury could reasonably conclude that his employer's decision not to promote him to crew chief or assign him to work the World Series was due to his race or national origin?

2.      Did the District Court correctly grant the employer summary judgment on the employee's disparate impact discrimination claims under Title VII, the NYSHRL, and the NYCHRL when (i) the employee failed to identify a facially neutral policy or practice; (ii) the employee failed to present any evidence of a statistically significant disparity that caused a disparate impact; (iii) the employer established that its practices are consistent with business necessity; and (iv) the employee failed to raise a triable issue of fact that an alternative practice would serve the employer's business needs?

1

## COUNTERSTATEMENT OF THE CASE

This is an appeal from the District Court's summary judgment dismissal of Plaintiff-Appellant Angel Hernandez's ("Hernandez") claims of disparate treatment and disparate impact discrimination against his employer, the Office of the Commissioner of Baseball and Major League Baseball Blue, Inc. (collectively, "MLB"), based on Hernandez's allegations that MLB did not promote him to a crew chief position or select him to work in the World Series between 2011-2017 because of his race and national origin. The District Court granted MLB's motion for summary judgment, holding that Hernandez had failed to raise a triable issue of fact with respect to his disparate treatment or disparate impact discrimination claims.

### A. Factual Background

1. The Role Of Major League Umpires And Crew Chiefs.

Hernandez is a Major League umpire. (A 25 ¶ 1.)[1] Major League umpires are responsible for officiating Major League Baseball games, and for maintaining discipline and order on the playing field. (SA 602.) Each umpire is assigned to a four-person crew, with one umpire designated as the crew chief. (SA 95-96; SPA 9.) The crew chief is the leader of the crew, the final decision-maker for all on-

---

[1] Citations to "A __" refer to the Joint Appendix, "SA __" to the Supplemental Appendix, "CSA __" to the Sealed Supplemental Appendix, "SPA __" to the Special Appendix, and "DE __" to the District Court docket entries.

field issues, and the person who ensures the crew's compliance with MLB's rules and policies.  (SA 95-97.)  The crew chief is responsible for, among other things, encouraging, initiating, and leading his crew's discussions of plays and rules; reporting any suspected non-compliance with MLB rules and regulations; and making crucial decisions on the field, such as whether a game will be delayed or forfeited.  (SA 7; SA 28; SA 603; SA 606-07.)

From March 2011 through December 2019, Joe Torre ("Torre"), then MLB's Chief Baseball Officer,[2] made the final decisions with respect to umpire-related employment decisions, including crew chief promotions and assignments to work Special Events, including the World Series.  (SA 2 ¶ 6; SA 419 ¶¶ 8-11; SA 143-145; SA 341-42; SA 307; SA 2 ¶ 6; *see also* SPA 10.)  MLB selected minority umpires to work in the World Series three times between 2011-2017, and selected one minority umpire in each of 2018 and 2019.  (A 322 ¶¶ 203-204; A 325 ¶ 216; A 326 ¶ 222; A 327 ¶¶ 226-227; A 328 ¶¶ 229-230.)

Hernandez pled in his complaint and testified at his deposition that Torre disliked him because of a call Hernandez made in 2001, when Torre managed the New York Yankees.  (SPA 13; SA 83-85; SA 121; SA 163-164; *see also* SA 412.) Torre criticized that call.  (SPA 13; SA 83-85; SA 163-164; SA 412.)  Hernandez

---

[2] Since January 2020, Torre has served as Special Assistant to the Commissioner of Baseball.  (SA 419 ¶ 12.)

admitted that Torre's criticism of him at that time was not in any way related to Hernandez's race, color, or national origin.  (SA 88; SA 90.)  Although Torre subsequently apologized to Hernandez for his criticism in 2001, Hernandez believes that Torre continued to harbor animosity towards him because of this game-play incident.  (SA 86-87; SA 121.)  Neither Torre nor anyone else employed by MLB ever made any comments to Hernandez that Hernandez believed to be based on his race, color or national origin.  (SA 90-91.)

Peter Woodfork, then Senior Vice President of On-Field Operations, reported directly to Torre and collaborated with Torre in making the decisions for crew chief promotions and World Series assignments.  (SA 419 ¶ 11; SA 608 ¶¶ 1, 3-5; SA 307; SA 2 ¶ 8.)

Vacancies for a permanent crew chief position are rare.  From 2011 through 2018, crew chief positions became available only in the following seasons:  2011 (two open positions), 2013 (three open positions), 2014 (two open positions), 2015 (two open positions), 2017 (three open positions), and 2018 (one open position).  (SA 595 ¶ 9.)  Hernandez did not apply for the 2015 openings.  (*Id.* ¶ 11.)  There were no crew chief openings for the 2012, 2016, or 2019 seasons.  (*Id.* ¶ 9; *see also* SPA 9.)[3]

_____

[3] Between 2011 and 2013, there were 17 permanent crew chief positions each season among the 68 full-time umpires.  (SA 594-95 ¶¶ 3, 5.)  Since 2014, there

World Series umpiring assignments are also limited. For each World Series from 2011 through 2013, only six out of 68-full-time umpires worked World Series games each year. (SA 35; SA 149; SA 277; SA 594 ¶ 3.) For each World Series since 2014, only eight out of 76 full-time umpires worked World Series games each year. (SA 11; SA 277-78; SA 149-50; SA 594 ¶ 4; *see also* SPA 9.) To be eligible to umpire in the World Series, an umpire must have worked in that year's Division Series. (SA 425 ¶ 27; SA 233; SA 249-250.)

2. <u>Hernandez's Deficient Performance In Areas Torre Considered Most Important For Permanent Crew Chiefs And World Series Assignments.</u>

Pursuant to the collective bargaining agreement (the "Basic Agreement") between MLB and the World Umpires Association (subsequently renamed the Major League Umpires Association), the labor union that represents all full-time Major League umpires, the parties agreed that MLB has discretion to rely on factors it "deems appropriate" in making crew chief promotion decisions. (SA 6-7; SA 27-28.) The Basic Agreement also vests MLB with discretion to make World Series assignments. (SA 10; SA 34-35; *see also* SPA 11.)

In exercising MLB's discretion with respect to crew chief promotions, the undisputed record evidence established that Torre considered a number of factors, including, but not limited to: leadership skills, situation management,

---

have been 19 permanent crew chief positions each season among the 76 full-time umpires. (*Id.* ¶¶ 4, 6; SPA 9).

demonstrating the requisite managerial skills necessary to lead a crew on and off the field, the ability to maintain composure and regain focus if an officiating error is made, overall quality of performance, fulfillment of administrative duties and responsibilities, initiative, and performance in the role of interim crew chief. (SA 420-21 ¶¶ 14-16; SA 426-27 ¶¶ 29, 33-34; SA 52-53; SA 58-59; SA 472-74; *see also* SA 322-23.) According to Torre, an umpire's consistent display of leadership skills is the most important attribute for crew chiefs. (SA 420 ¶ 15; SA 169; SA 185-88; SA 217; SA 219-21.) Hernandez expressly admitted that he does not know what factors MLB considers in connection with crew chief promotion decisions. (SA 98-99; *see also* SPA 11-12.)

Similarly, for selection for the World Series—the most important games of the season—Torre considered many of these same factors, with the goal of selecting umpires who have displayed the highest levels of performance that season and throughout their careers, and have demonstrated the ability to perform in critical and visible roles. (SA 421 ¶ 16; SA 609 ¶ 6; SA 151; SA 227; SA 232-233, SA 272; SA 343.) In making World Series assignments, the undisputed record evidence established that Torre gave particular consideration to umpires who demonstrated the ability to manage on-field situations under intense pressure; took responsibility for their on-field decisions; maintained composure and regained focus immediately if an officiating error was made; and applied and conveyed

6

rules correctly and clearly. (SA 421-22 ¶¶ 16, 20; SA 169; *see also* SA 329-30.) Of these considerations, maintaining a high level of focus on the field, being able to quickly refocus if an incorrect call is made, and allowing fans to keep their focus on the game and players the rather than on the actions of the umpires were particularly critical to Torre. (SA 421-22 ¶¶ 16, 20.) In Torre's expertise, the foregoing factors are much more important than an umpire's seniority (which, according to the Basic Agreement, is not a controlling factor). (SA 6; SA 27; SA 191-192; SA 194; SA 261; SA 322.)

The undisputed record evidence also established that Torre did not place significant weight on field evaluation reports ("Field Evaluation Forms"), for either crew chief or World Series positions. (SA 421-22 ¶ 18; SA 287-89.) These reports are completed only for individual games that are observed in-person and are strictly limited to predetermined criteria concerning on-field performance in that individual game—not the specific competencies of leadership ability or ability to perform in high pressure games that Torre considered most important for permanent crew chiefs and World Series assignments. (SA 421-22 ¶ 18; SA 154; SA 201; SA 216-19; SA 229; *see also* SA 350; SPA 9.)[4]

---

[4] In addition, while the ability to accurately call balls and strikes and judge runners on the bases is a consideration, it is not a determinative factor because all Major League umpires are proficient in those metrics (as they would not hold one of only 76 Major League umpire positions). (SA 427 ¶ 34; SA 159; SA 355-56.) In any event, the undisputed record evidence is that Hernandez's ability to accurately call

i. *Hernandez's Lack Of Accountability And Inability To Move Past His Mistakes Are Qualities The MLB Decision-maker Deemed Inconsistent With On-Field Leadership.*

In Torre's judgment, effective leaders accept responsibility for their actions and those of their crew, hold themselves accountable for their successes and failures, and seek to learn from the past rather than dwell and shift blame to others. (SA 428-29 ¶ 37; SA 185-86; SA 219-21; SA 244-45.)  In Torre's view, Hernandez repeatedly has been unable or unwilling to take responsibility for his mistakes and, as a result, has been unable to move past those mistakes so that he can remain 100 percent focused on the game.  (SA 422-23 ¶ 21; SA 185-88; *see also* SA 325-26.)

Most notably, the undisputed record evidence established that Hernandez has for years been preoccupied with an incorrect call he made on May 8, 2013, during a game that took place in Cleveland.  (SA 422-23 ¶ 21; SA 170-73; SA 404; CSA 313-14; CSA 316; CSA 318-19.)  Hernandez was an interim crew chief during that game.  (SA 114.)  A visiting player hit a long fly ball, which Hernandez ruled a double.  (SA 115-16; SA 60-61.)  The umpires were asked to review video of the call to determine whether the ball cleared the fence and should be ruled a home run instead.  (SA 114.)  Although the hit was a home run, Hernandez did not

---

balls and strikes and judge runners on the bases has been inconsistent and often below average compared to other umpires.  (SA 197; SA 315; SA 259-60; CSA 1-18.)

change his original incorrect call after he reviewed the replay, a mistake that affected the outcome of the game.  (SA 115-17; SA 170.)  For years, Hernandez has refused to admit that the call he made was incorrect and instead has attempted to blame the quality of the replay equipment.  (SA 422-23 ¶ 21; SA 114; SA 117-120; SA 170-71.)

Hernandez's inability to put the Cleveland incident behind him—and his continued insistence that others were at fault for his wrong decision—was emblematic of why Torre considered him to be unsuitable for World Series assignments and a permanent crew chief role.  (SA 422-23 ¶ 21; SA 609 ¶ 7; SA 177; SA 244-45.)  The issue was not the bad call itself, but Hernandez's reaction to his mistake; Torre deemed that reaction the exact opposite of the type of leadership, personal accountability, and focus he sought of umpires to work the World Series and of permanent crew chiefs.  (SA 422-23 ¶ 21; SA 177; SA 244-45.)

The undisputed record evidence confirmed that MLB repeatedly and emphatically addressed Hernandez's inability to accept and move on from mistakes and attempted to refocus him year over year, while Hernandez repeatedly dismissed these concerns.  (SA 423 ¶ 22.)

- In 2013, MLB advised Hernandez to "[c]ontinue to work on presenting a positive and professional demeanor on the field.  If an issue does arise, do your best to solve it and move on.  Try not to harp on the same issue

as it can take away from the rest of your umpiring." *(SA 423 ¶ 22; SA 449.)*

- In 2014, MLB told Hernandez that his desire for added responsibility "would only come to fruition with your ability to remain focused on the present and things that you can control," and that "you need to continue to take steps forward in your communication and your accountability before this can happen . . . . [Y]ou need to be accountable to yourself and let things from the past go. You continue to harp on matters that happened many years ago; this behavior is not healthy and not what we expect from a crew chief or any umpire. You need to learn from the past and then move forward." (SA 423-24 ¶ 23; SA 454; SA 463.)

- In 2015, Torre reiterated this message when Hernandez brought up the Cleveland incident yet again, and encouraged Hernandez to continue working with a counselor to help Hernandez move forward. (CSA 326 ¶ 24; CSA 316; SA 404.)

- In 2016, after observing that Hernandez had missed calls in bunches, MLB again emphasized that it is "vital that you can overcome any issues on the field and move to the next play. Try not to dwell too much on past performance." (SA 424 ¶ 25; SA 468.)

- In 2017, MLB again specifically informed Hernandez that "in order to enhance your candidacy for a Crew Chief position, we would like to see you…continue to improve your situation management, and display an ability to refocus and move forward after missed calls or receiving constructive feedback from the Office." *(SA 425 ¶ 26; SA 472-74.)*

Despite all of this feedback, Hernandez's inability to recover from mistakes continued to manifest, including at a most inopportune time during the 2018 American League Division Series between the New York Yankees and Boston Red Sox—a high-profile series between historic rivals. (SA 425 ¶¶ 27-28.) The undisputed record evidence is that Torre selected Hernandez for the Division Series in 2018 with the intention of providing him an opportunity to umpire in the

World Series that year. *Id.* Hernandez did not capitalize on that opportunity and did not rise to the occasion. *Id.* Specifically, in Game 3 of that series, three of Hernandez's calls were overturned via instant replay in the first four innings alone. (SA 130; SA 425 ¶ 28.) This was the first time since the advent of expanded instant replay in 2014 that an umpire had three calls overturned in a postseason game. (SA 131; SA 425 ¶ 28.) Based on his performance during that Division Series playoff game, Torre was not confident in Hernandez's ability to perform effectively on an even more intense stage, and for this reason did not select him for the World Series that season. (SA 425 ¶ 28.)

> ii. *Hernandez Was Unable To Successfully Handle Difficult On-Field Situations With A Calm And Professional Demeanor On A Consistent Basis.*

Defusing on-field situations involving players and managers while displaying a calm and professional demeanor is even more critical during the World Series than during the regular season. (SA 426 ¶ 29.) It is also an essential skill for a permanent crew chief. *Id.* In Torre's judgment, Hernandez has not demonstrated these skills on a consistent basis. (SA 422 ¶¶ 19-20; SA 426 ¶ 29; SA 169-70; SA 185-86; SA 221; SA 238-39.) For example, the undisputed record evidence confirmed that Hernandez has been quick to eject managers, which enflames on-field tensions, rather than issue warnings that potentially could defuse those situations. (SA 426 ¶¶ 29, 31; SA 445; SA 478.) Hernandez also has failed

11

to communicate with other umpires on his crew, which has resulted in confusion on the field and unnecessary game delays.  (SA 423-24 ¶ 23; SA 429-30 ¶ 40; SA 459; SA 606-07; *see also* SA 317-18.)

Hernandez's on-field demeanor has been a problem for him as well.  In 2013, Hernandez ejected a manager after an incident in which Hernandez changed his own call.  (SA 426 ¶ 29.)  Hernandez's year-end evaluation for that year stated that Hernandez's action created an on-field situation which escalated to an ejection that could have been avoided had Hernandez handled it better.  (SA 445-46.)  In 2014, Torre observed that Hernandez threw his headset after instant replay review overturned a call he made.  (SA 426 ¶ 30; *see also* SA 172.)  This was particularly troubling to Torre because 2014 was the first year of expanded replay review, and MLB needed all umpires to demonstrate that they embraced this change.  (SA 426 ¶ 30.)  In 2015, Hernandez ejected two different managers following on-field arguments, without issuing a warning to either manager.  (SA 426 ¶ 31.)  In his year-end evaluation, Hernandez was told that "[i]ssuing a simple warning . . . might be enough to keep them in the game" before moving to ejections.  (SA 478.)  This pattern continued in 2017, when Torre observed Hernandez unnecessarily confronting a pitcher who had walked off the mound after thinking

12

he had thrown a third strike to end the inning, which Hernandez called a ball. (SA 426-27 ¶ 32.)[5]

### iii. *Hernandez Struggled As An Interim Crew Chief In Multiple Seasons.*

When a permanent crew chief is not able to work because of vacation, injury, illness or some other reason, MLB selects umpires to serve as "interim crew chiefs." (SA 312.) The quality of an umpire's performance while serving as an interim crew chief is an important indicator of an umpire's ability to perform in a more critical, visible role and in a leadership capacity, and is a more important factor, according to Torre, than the mere number of games in an interim crew chief assignment. (SA 427 ¶ 33; SA 187; SA 230-31; *see also* SA 321; SA 324.) Based on his performance as an interim crew chief, Torre concluded that Hernandez has not demonstrated readiness for promotion to a permanent leadership position or to umpire in a more critical and visible role. (CSA 330-334 ¶¶ 36-42.)

For example, while acting as interim crew chief, Hernandez asked Cincinnati Reds Pitcher Homer Bailey to autograph eleven baseballs following a game in which Bailey pitched a no-hitter. (SA 123-24; SA 126-27; CSA 330 ¶ 36; CSA 348-50.) Hernandez's conduct violated provisions of the Basic Agreement

---

[5] As the pitcher walked off the mound, Hernandez took his mask off, put his hands on his hips, walked out from behind the plate, and confronted the pitcher about his movement off the mound. *Id.* Because Torre had concerns about this incident, he spoke to Hernandez. *Id.* During that conversation, Torre told Hernandez that he was unnecessarily confrontational with the pitcher. *Id.*

and Umpire Manual, which state, among other things, that umpires cannot directly or indirectly ask players for autographs, must be cautious about casual fraternization with Club employees for the purposes of avoiding appearances of impropriety, and must avoid the appearance of a conflict of interest and/or undue influence.  (CSA 330 ¶ 36; CSA 348-50; SA 606; SA 126-27; SA 29-30; SA 32.)  Hernandez's misconduct was exacerbated by the fact that he was serving in a leadership role and he understood that his actions violated MLB rules.  (SA 125-126; CSA 330 ¶ 36.)  Torre advised Hernandez at the time that his actions were unprofessional and demonstrated extremely poor judgment, and were particularly egregious because, as interim crew chief, he was supposed to set a positive example for the rest of his crew.  (CSA 330 ¶ 36; CSA 348-50; SA 126-27.)

Significantly, Hernandez also was interim crew chief during the May 8, 2013 game in Cleveland, discussed above, in which he made the incorrect call and refused to accept responsibility for his mistake.  (SA 428-29 ¶ 37; SA 60-61; SA 114.)

As a result of Hernandez's performance as an interim crew chief in 2012 and 2013, as well as his other performance issues discussed above, Torre did not ask Hernandez to serve as an interim crew chief for more than one week in each of the 2014-17 seasons.  (SA 429 ¶ 38.)  On those occasions, Hernandez was asked to fill

14

in only on a very limited basis while the crew chief on his crew was unavailable.
*Id.*

In 2018, Torre gave Hernandez the opportunity to serve as an interim crew chief for nearly one full month of the season. (SA 429 ¶ 39.) Hernandez's performance that season merited a post-season assignment to the American League Division Series, with an eye towards placing him in the World Series. *Id.* There were no crew chief openings at the end of 2018 for the 2019 season, and Torre did not select Hernandez for the World Series that year based on his performance in the Division Series discussed above. (SA 425 ¶¶ 27-28; SA 429 ¶ 39.)

In 2019, Torre provided Hernandez with another opportunity to serve as an interim crew chief. (SA 429-30 ¶ 40.) During a game between the Boston Red Sox and Tampa Bay Rays in July 2019, when Hernandez was the interim crew chief, Hernandez misapplied a rule involving the effect of the substitution of players on the lineup—a rule that Hernandez's supervisor specifically reinforced with him immediately prior to that series. (*Id.*; CSA 352-53.) Hernandez compounded his error by not communicating clearly with the managers or his crew members, which ultimately led to a 14-minute delay of game and the Red Sox playing the rest of the game under "protest," which, under the rules, could have resulted in the game being replayed from the point of the disputed ruling. (SA 429-30 ¶ 40; CSA 352-53.) In Torre's judgment, this incident further illustrated

15

Hernandez's struggle to maintain control and de-escalate tense on field situations. (SA 429-30 ¶ 40.)

Following the game, MLB commenced an investigation into the Red Sox-Rays on-field incident. (SA 430 ¶ 41; CSA 352-53.) As part of the investigation, MLB interviewed the umpires involved via separate telephone interviews. (CSA 73-74; CSA 352-53.) During that investigation, MLB concluded that: (i) Hernandez intentionally and deceptively eavesdropped on a confidential conversation with another umpire on his crew in order to hear what that umpire would say concerning the incident; and (ii) when MLB asked Hernandez about it, he lied about his conduct. (SA 430 ¶ 41; CSA 75; CSA 352-53.) Torre removed Hernandez as interim crew chief from that point forward in the 2019 season. (SA 430 ¶ 42.)

As the foregoing makes clear, MLB's decisions always have been strictly based on its legitimate, good-faith assessments of Hernandez's unsuitability to serve as a permanent crew chief and umpire the most critical games in the World Series. Tellingly, Hernandez admitted that he does not know of any specific facts to support the claim that his not being selected for a crew chief position in the years he applied was related to his race, color, or national origin. (SA 94-95.) The record in this case is entirely devoid of any such facts.

3.   The Undisputed Expert Evidence Established That There Was No Disparity In MLB's Selection Rates Between White And Non-White Umpires For Crew Chief Or World Series Positions.

MLB's expert, Dr. Denise Martin, analyzed all possible outcomes for crew chief and World Series selections using the Fisher's Exact test, a statistical test specifically designed for small sample sizes.  (SA 492-93 ¶¶ 13-16.)  The Fisher's Exact test is the most appropriate test for relatively small sample sizes like those at issue here.  (SA 492 ¶ 13; SA 513-14 ¶ 29; SA 360; SA 363-64.)  Dr. Martin also used an alternative Chi-Squared test for larger sample sizes and the results were qualitatively similar.  (SA 360; SA 515 ¶ 33 n.29.)

Dr. Martin concluded that the observed outcomes for crew chief promotions and World Series selections were "statistically likely" and that there was *no statistical significance* to the fact that there were no minority umpires promoted to crew chief between 2011 and 2018 and that there were three instance of minority umpires being selected for the World Series between 2011 and 2018.  (SA 493-98 ¶¶ 16-21; SA 514-15 ¶¶ 30-33; SA 359-61.)  According to Dr. Martin's undisputed expert testimony, not only was there no statistically significant disparity, but the "promotion rates and selection rates for minorities d[id] not differ from the promotion rates and selection rates for white umpires."  (SA 361; *see generally* SA 491-98 ¶¶ 9-21; SA 502 ¶ 2; SA 512-15 ¶¶ 23-33.)

17

**B.     Proceedings Below**

In July 2017, Hernandez commenced an action in the United States District

Court for the Southern District of Ohio, alleging, *inter alia*, race and national

origin discrimination under Title VII, Section 1981, and Ohio state law.  (DE 1.)

Hernandez also sought a declaratory judgment that he be permitted to speak

publicly about his allegations.  *Id.* ¶¶ 136-138.  The case was transferred to the

United States District Court for the Southern District of New York (Hon. J. Paul

Oetken) in October 2018.  (DE 15.)  On November 27, 2018, Hernandez filed a

First Amended Complaint asserting the same causes of action and adding

discrimination claims under the NYSHRL and NYCHRL.  (A 25-48.)  MLB

moved to dismiss Hernandez's Ohio law claim, which the District Court granted in

July 2019.  (DE 84.)

In March 2019, Hernandez moved for summary judgment on his claim for

declaratory relief, seeking a declaration that he be permitted to "speak freely"

about his allegation that MLB discriminated against him and others.  (DE 51.)  On

October 30, 2019, the District Court denied Hernandez's motion and dismissed

Hernandez's claim for a declaratory judgment.[6]  (SPA 1-7.)

---

[6] Hernandez indicated in his Notice of Appeal that he would be appealing the
District Court's October 30, 2019 decision dismissing his claim for declaratory
relief.  (A 669.)  Hernandez did not address this issue in his moving brief, and it is
therefore waived. *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199,

On November 27, 2019, Hernandez filed an "Amendment to his Complaint" in which he asserted discrimination claims under a disparate impact theory. (A 71-80.) Hernandez again reiterated his allegation that Torre's alleged "history of animosity towards Hernandez stemm[ed]" from a perceived incorrect call in 2001 when Torre was the manager of the New York Yankees. (A 71 ¶ 153; A 30 ¶¶ 34-37.)

Following the close of discovery, Hernandez moved for partial summary judgment and sought a ruling that he had established his *prima facie* case as to his disparate treatment and disparate impact discrimination claims. (DE 138.) MLB cross-moved for summary judgment and sought dismissal of all of Hernandez's claims in their entirety. (DE 164.) On March 31, 2021, Judge Oetken issued an Opinion and Order granting Defendants' motion for summary judgment in its entirety, and denying Hernandez's motion for partial summary judgment as moot. (SPA 8-33.) As to Hernandez's Title VII, Section 1981, and NYSHRL disparate treatment claims, Judge Oetken found that Hernandez failed to raise a triable issue of fact that MLB's reasons for not promoting him or assigning him to the World Series were pretextual. (SPA 15-27.) The District Court similarly held that

---

203 n.1 (2d Cir. 2013); *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

Hernandez could not establish a claim of disparate treatment discrimination under the NYCHRL because "Hernandez has not shown that MLB treated him less well than other umpires 'at least in part for discriminatory reasons.'" (SPA 27.)

The District Court also dismissed Hernandez's disparate impact claims. (SPA 27-30.) The District Court relied on MLB's expert's evidence—which Hernandez did not refute—that indisputably established the absence of a statistically significant disparity between the promotion and selection rates of minority and non-minority umpires. *Id.* The District Court further stated that even if Hernandez had been able to make the requisite statistical showing, his disparate impact claims would still fail because he failed to present an alternative practice that "would eliminate the disparity at issue." *Id.*

On April 28, 2021, Hernandez filed a "Motion to Alter, Amend, or Vacate the Court's March 31, 2021 Opinion and Order" in which he argued that the District Court erred in dismissing his disparate impact claims, and improperly made credibility determinations and weighed evidence in dismissing Hernandez's disparate treatment claims. (DE 199.) The District Court denied Hernandez's motion on January 20, 2022. (SPA 35-39.) The District Court held that it did not overlook a controlling issue of law or make a clear error. (SPA 37-39.) The District Court also rejected Hernandez's argument "that the Court improperly weighed evidence", which was allegedly based on "instances where the Court

20

noted in its decision that the record was not entirely clear on how MLB develops

evaluations and the criteria that MLB uses in making crew chief promotions."

(SPA 39.)  The District Court explained that "any ambiguity about the evaluation

and promotion process was ultimately due to the subjectivity of some criteria, *not*

due to any genuine disputes of material fact."  *Id.* (emphasis in original.)

     Hernandez filed a Notice of Appeal on February 18, 2022.  (A 669.)

## <u>SUMMARY OF THE ARGUMENT</u>

     This Court should affirm the District Court's dismissal of Hernandez's

claims because Hernandez failed to raise a genuine dispute of material fact on any

of the required elements of disparate treatment or disparate impact discrimination.

     In his appeal, Hernandez has all but abandoned any argument that he was the

victim of intentional discrimination, relegating his discussion of his disparate

treatment claims to a few pages at the end of his brief.  As that discussion makes

clear, Hernandez has not presented, and the record does not contain, a scintilla of

evidence that MLB's actions were based on his race or national origin, as is

required to survive summary judgment.  To the contrary, Hernandez affirmatively

pled—and then testified in deposition—that Torre did not like him because of an

on-field incident that Hernandez admitted was *not* based on any protected

characteristic.  Although Hernandez asserts that Judge Oetken usurped the role of

the jury, the Opinion and Order makes clear that the District Court correctly

understood its role to determine whether there was a disputed issue of material fact. With respect to that question, Judge Oetken properly concluded that any minor variations in MLB's otherwise consistent explanations for its employment decisions were due to the subjective nature of certain criteria on which MLB was entitled to rely in selecting crew chiefs and World Series umpires—and that there was no evidence whatsoever that any variations were a pretext for unlawful discrimination. The District Court's acknowledgment that MLB presented legitimate and non-discriminatory reasons for its employment decisions is also not a "jury function", but rather part of the required burden-shifting analysis applicable to discrimination claims. Because there was no evidence, much less a disputed issue of material fact, that MLB's good faith explanations for not promoting Hernandez to crew chief or assigning him to the World Series were a pretext for discrimination, the District Court properly granted summary judgment with respect to Hernandez's disparate treatment discrimination claims.

Hernandez's principal claim on appeal—that the District Court erred in dismissing his disparate impact claims—likewise fails for lack of evidence. The District Court correctly held that Hernandez did not present a triable issue of fact as to the existence of any policy that caused a statistically significant disparate impact on minority umpires. In fact, Hernandez did not present *any* statistical analysis of a disparity at all. The District Court further held that even if a

22

statistically significant disparate impact did exist, Hernandez's claim would still fail because the skills that MLB focused on in selecting crew chiefs and World Series umpires are wholly consistent with business necessity. As the District Court correctly held, Hernandez did not present a triable issue of fact as to the existence of an alternate practice that would serve MLB's legitimate business need to have its best umpires staffed in these crucial roles.

On appeal, Hernandez's entire disparate impact theory rests on the misguided premise that he is relieved of his burden of establishing statistical significance because of the so-called "inexorable zero". That is wrong as a matter of well-settled law because bottom line numbers are not a substitute for the required statistical proof. Indeed, the "inexorable zero" is not even an adverse impact theory, but rather can be evidence of discriminatory animus in the context of *disparate treatment* claims in circumstances not applicable here—*i.e.*, when there is a sufficiently large workforce and number of selection opportunities.[7] The inexorable zero does not, and cannot, establish a disparate impact because, by

---

[7] The District Court correctly rejected the idea that the "inexorable zero" supported Hernandez's disparate treatment claim because of the very small size of the population at issue and the number of available crew chief and World Series roles. (SPA 23.) In any event, because Hernandez does not argue the inexorable zero theory in his appeal of the dismissal of his disparate treatment claims, that argument is waived. *See supra* n.6.

definition, a disparate impact requires a statistical analysis comparing the promotion and selection rates of minority and non-minority candidates.

While Hernandez now baldly asserts that the District Court overlooked binding legal precedent in dismissing his disparate impact claims, he ironically has not cited a single case, much less any Second Circuit case, where a court has allowed a disparate impact claim to proceed in the absence of statistical evidence or based on the so-called "inexorable zero." Indeed, courts in this Circuit and elsewhere have held repeatedly, and uniformly, that the "inexorable zero" does not, on its own, have any statistical significance and does not establish a disparate impact. The "inexorable zero" is especially meaningless in this case given the undisputed statistical evidence establishing the *absence* of any disparate impact in this case. Hernandez also does not meaningfully dispute that MLB's consideration of leadership qualities and the ability to perform in high-pressure situations are legitimate factors in deciding which umpires will hold leadership positions, nor has he shown an alternative policy that would meet MLB's legitimate business need of having its very best leaders in leadership positions. The District Court therefore properly dismissed Hernandez's disparate impact claims.

## STANDARD OF REVIEW

This Court reviews a decision granting summary judgment *de novo*. *Montgomery v. N.Y.C. Transit Auth.*, 806 F. App'x 27, 30 (2d Cir. 2020) (summary

order).  To survive summary judgment, Hernandez was required to establish a

triable issue of fact via admissible evidence without relying on speculation or

unsupported allegations.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986); *Nguedi v. Fed. Reserve Bank of N.Y.*, 813 F. App'x 616,

617-18 (2d Cir. 2020) (summary order).  *See also Pierre v. City of N.Y.*, 844 F.

App'x 411, 413 (2d Cir. 2021) (summary order), citing *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010).  This Court should affirm the judgment if there is no

genuine issue as to any material fact and therefore the moving party is entitled to

judgment as a matter of law.  *Shaikh v. Nat'l Bank of Pakistan*, 847 F. App'x 45,

46 (2d. Cir. 2021) (summary order), citing *Sotomayor v. City of N.Y.*, 713 F.3d

163, 164 (2d Cir. 2013).

These standards apply equally in cases involving allegations of employment

discrimination or retaliation.  The Second Circuit has consistently recognized that

"the salutary purposes of summary judgment—avoiding protracted, expansive and

harassing trials—apply no less to discrimination cases than to . . . other areas of

litigation."  *Desir v. City of N.Y.*, 453 F. App'x 30, 33 (2d Cir. 2011) (summary

order), citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  *See

also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

Furthermore, these summary judgment standards apply equally to claims under the

NYCHRL.  *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015).

## **ARGUMENT**

## I. **THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON HERNANDEZ'S DISPARATE TREATMENT CLAIMS.**

The District Court properly concluded that Hernandez failed to raise a triable issue of fact on his disparate treatment discrimination claims.  The District Court's thorough and well-reasoned decision dismissing Hernandez's claims should be affirmed.

### A.  Legal Standard

To establish a prima facie case of race and national origin intentional discrimination under Title VII, Section 1981, the NYSHRL, and the NYCHRL, Hernandez was required to present admissible evidence that:  (i) he is a member of a "protected class"; (ii) he applied for and was qualified for the position in question; (iii) he was denied the position; and (iv) he "'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009), citing *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998).[8]  If the plaintiff can

---

[8] Claims of race discrimination under Title VII, § 1981 and the NYSHRL are analyzed under the same standards.  *See Johnson v. N.Y.C. Dep't of Educ.*, 633 F.

establish a prima facie case, the burden shifts to the defendant, who must

articulate—but need not prove—a legitimate, non-discriminatory reason for its

actions. *Aulicino*, 580 F.3d at 80. Once the defendant satisfies its burden of

production, the burden then shifts back to the plaintiff to prove by a preponderance

of the evidence that the legitimate, nondiscriminatory reason offered by the

defendant is a pretext for unlawful discrimination. *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 804 (1973). The defendant will be entitled to summary

judgment unless the plaintiff can point to evidence reasonably supporting a finding

of prohibited discrimination. *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d

Cir. 2000).

The District Court "presume[d], without deciding, that Hernandez has met

his *prima facie* burden" and therefore focused its analysis on "whether Hernandez

has offered sufficient evidence of pretext to survive MLB's motion for summary

judgment." (SPA 16.) To establish pretext, Hernandez has the burden to establish

---

App'x 42, 43 (2d Cir. 2016) (summary order); *Gachette v. Metro-North Commuter R.R. Co.*, 804 F. App'x 65, 67 (2d Cir. 2020) (summary order).

Under the NYCHRL, Hernandez must show that he was treated "less well" than his counterparts in part "because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). "Notwithstanding this different analysis, the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 522 (S.D.N.Y. 2019).

"sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Campbell v. Nat'l Fuel Gas Distrib. Corp.*, 723 F. App'x 74, 75 (2d Cir. 2018) (summary order) (internal citation omitted). The burden of establishing pretext "is a higher burden than that required to establish the *prima facie* case." *Isaac v. City of N.Y.*, 701 F. Supp. 2d 477, 488 (S.D.N.Y. 2010), citing *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985). "Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (summary order).

A plaintiff's burden to establish pretext in a case as here involving failure to promote is particularly high. To satisfy this burden, Hernandez must show that his "credentials were so superior to the person hired that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Wood v. N.Y.C. Transit Auth.*, 699 F. App'x 76, 77 (2d Cir. 2017) (summary order), citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001). A plaintiff's "subjective assessment of [his] own qualifications is insufficient to create a genuine issue as to whether the defendant's proffered reason for its [] decisions are pretext for discrimination."

28

*Shands v. Lakeland Cent. Sch. Dist.*, No. 15-cv-4260 (KMK), 2018 WL 3315738, at *17 (S.D.N.Y. July 5, 2018) (internal citation omitted), *aff'd*, 771 F. App'x 121 (2d Cir. 2019) (summary order).

The District Court reviewed the evidence presented and correctly found that Hernandez failed to raise a genuine issue of material fact as to whether MLB's stated reasons for not promoting Hernandez to a crew chief position or assigning him to the World Series were a pretext for discrimination. (SPA 17-27.)

## B. The District Court Did Not Assume The Role Of The Jury In Holding That Hernandez Failed To Raise A Triable Issue Of Material Fact.

Hernandez does not offer any meaningful challenge to the District Court's decision dismissing his disparate treatment claims. In particular, on appeal he does not even address Judge Oetken's determination that there was no genuine dispute of material fact that:

- MLB's promotion decisions were based primarily on umpires' leadership and situation management skills. (SPA 19-20.)

- Torre did not believe that Hernandez had the leadership and situation management skills required for crew chief or World Series roles. (SPA 23-27.)

- The candidates Torre appointed to those roles instead of Hernandez have not had the same pattern of performance issues as Hernandez. (SPA 22-23.)

- Hernandez did not present evidence that he was "so significantly better than the promoted umpires" that a discriminatory motive could be inferred. (SPA 19.)

29

In the face of all of the undisputed record evidence confirming the absence of pretext, Hernandez perfunctorily suggests that the District Court improperly invaded the province of the jury. The District Court did no such thing. Based on all of the undisputed facts, and the absence of any evidence that discrimination played a role in Torre's decisions, Judge Oetken "conclude[d] that no reasonable juror could find that MLB's stated explanation is a pretext for discriminatory motive." (SPA 26.) Nothing Hernandez cites in his opening brief warrants reversal of that conclusion.

For example, Hernandez claims that the District Court usurped the role of the jury because it noted purported inconsistencies in the record evidence concerning the development of performance evaluations and the weight Torre placed on various promotion criteria. (Pl. Br. 44-45.) But, as the District Court explained, the "slightly different explanations" that Hernandez complains of "are not genuinely inconsistent, but are a reflection of the subjective and multi-faceted nature" of MLB's decisions. (SPA 20.) Judge Oetken reiterated this in his decision denying Hernandez's Rule 59 motion: "any ambiguity about the evaluation and promotion process was ultimately due to the subjectivity of some of the criteria . . . *not* due to any genuine disputes of material fact." (SPA 39 (emphasis in original).) This Court has explained, and the District Court correctly stated, that there is "nothing unlawful" when an employer relies on subjective

criteria in its decisionmaking, as is the case here.  (SPA 24, citing *Byrnie*, 243 F.3d at 104.)

In any case, Hernandez's opening brief does not identify a single inconsistency that he claims to be evidence of discriminatory animus.  This Court has made clear that, in the context of discrimination claims, inconsequential "inconsistencies" are insufficient to establish pretext when there is no evidence of discrimination.  *See, e.g.*, *McEvoy v. Fairfield Univ.*, 844 F. App'x 420, 421-22 (2d Cir. 2021) (summary order) (rejecting plaintiff's argument that the defendant's inconsistent explanations warranted reversal of summary judgment because "any inconsistencies pointed out by [plaintiff] are too immaterial to constitute evidence of pretext here"); *Deabes v. Gen. Nutrition Corp.*, 415 F. App'x 334, 336 (2d Cir. 2011) (summary order) (alleged inconsistencies were insufficient to create a genuine issue of material fact because the plaintiff  "pointed to no evidence that would permit a rational factfinder to infer that [defendant] was motivated by unlawful discriminatory intent"); *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (rejecting plaintiff's argument that "inconsistencies" in testimony about the reasons for plaintiff's termination demonstrated pretext because those inconsistencies were "at best, minor" and "there [were] no material inconsistencies that might cause a reasonable jury to doubt" defendant's reasons).

31

Hernandez's claim that the District Court made "credibility determinations by accepting at face value MLB's proffered explanation" for not promoting him misconstrues the applicable burden-shifting framework. (Pl. Br. 45.) Assuming that Hernandez could establish a prima facie case of intentional discrimination, the burden then shifts to MLB to articulate, but not prove, nondiscriminatory reasons for its actions. *Aulicino*, 580 F.3d at 80. There is certainly nothing erroneous about the District Court acknowledging that MLB satisfied its burden of production—an acknowledgment not taken "at face value" but rather based on the undisputed evidence of MLB's reasons for not promoting him, namely Hernandez's deficiencies in leadership ability and situation management skills. (*See* CSA 324-332 ¶¶ 19-42; SA 169-73; SA 181-82; SA 185-88; SA 238-39; SA 244-45; *see also* SA 315-16; SA 318-19; SA 325-26.)

Hernandez additionally contends that the District Court engaged in "jury functions" by "[e]ngaging in a step-by-step analysis of what the District Court contends the jury must factually conclude regarding Mr. Hernandez's disparate treatment claim before ultimately determining no reasonable juror could make those conclusions." (Pl. Br. 45.) In essence, Hernandez contends that the District Court engaged in "jury functions" by dismissing his claim that the contents of his Field Evaluation Forms ("FEFs") evidenced discrimination. Hernandez makes no effort to explain why the District Court's conclusion in this regard warrants

reversal.  The undisputed record evidence established that FEFs were afforded minimal weight in the crew chief and World Series decision-making processes for *all* umpires—not just Hernandez—because MLB executives considered them to be merely snapshots of individual games that do not measure the specific competencies pertinent to those positions.  (A 579-80 ¶ 74; SA 154; SA 201; SA 218-19.)  And, as the District Court correctly noted, Hernandez did not "reliably establish any systematic effort on MLB's part to artificially deflate [his] evaluations, much less an effort to do so in order to cover up discrimination." (SPA 21-22.)  The District Court's conclusion that Hernandez failed to raise a genuine dispute of material fact sufficient to establish pretext with respect to his performance evaluations is a quintessential judicial function at the summary judgment stage.

Hernandez has failed to establish that the District Court engaged in "jury functions" warranting reversal.  Accordingly, the District Court's decision dismissing Hernandez's disparate treatment claims should be affirmed.

## II. THE DISTRICT COURT PROPERLY DISMISSED HERNANDEZ'S DISPARATE IMPACT CLAIMS BECAUSE HERNANDEZ FAILED TO RAISE A TRIABLE ISSUE OF FACT ON ANY OF THE REQUIRED ELEMENTS.

The District Court properly concluded that Hernandez failed to proffer sufficient evidence to survive summary judgment on his disparate impact discrimination claims.

### A. Legal Standard

In order to establish a prima facie case of disparate impact discrimination, Hernandez was required to: "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (internal citations omitted); *Wharff v. State Univ. of N.Y.*, 413 F. App'x 406, 408 (2d Cir. 2011) (summary order) (internal citation omitted).

If Hernandez were to establish a prima facie case, MLB can rebut it by "undermin[ing] the plaintiff's disparate impact or causal analysis," and if "[MLB] is successful in doing so, that ends the matter." *Mandala*, 975 F.3d at 208. Alternatively, "[MLB] may rebut [his] prima facie showing by 'demonstrating that the challenged practice is job related for the position in question and consistent with business necessity.'" *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006), citing 42 U.S.C. § 2000e-2(k)(1)(A)(i) (internal alteration omitted).[9]  If the defendant meets its burden, the burden shifts back to the plaintiff "to show that other tests or selection devices, without a similarly undesirable racial effect, would

---

[9] Under the NYCHRL, the defendant may rebut an inference of discrimination by demonstrating that the "policy or practice bears a significant relationship to a significant business objective . . . or does not contribute to the disparate impact." N.Y.C. Admin. Code § 8-107(17)(a).  A "significant business objective" includes "successful performance of the job." *Id.*

also serve the employer's legitimate interest." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). *See also Mandala*, 975 F.3d at 208.

### B. Hernandez Failed to Identify a Policy or Practice.

Hernandez's disparate impact claims were properly dismissed because he failed to identify a facially neutral policy or practice that caused a disparate impact. A plaintiff asserting a disparate impact claim "must begin by identifying the specific employment practice that is challenged." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). "[I]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such impact." *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005). The identification of a particular employment practice is an "integral part of the plaintiff's prima facie case", and "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989).

The purported "policy or practice" on which Hernandez relies is that Torre makes promotion decisions that involve subjective performance assessments. But that is not a sufficient "policy or practice" for purposes of stating a disparate impact claim because it is nothing more than a challenge to the process as a whole. And "[s]imply gesturing towards the hiring process as a whole will not satisfy the

requirement that the plaintiff identify a 'specific employment practice[.]'" *Byrnie*, 243 F.3d at 111. *See also Okeke v. Adm'rs of Tulane Educ. Fund*, No. 21-30451, 2022 WL 1025991, at *6 n.7 (5th Cir. Apr. 6, 2022) (affirming summary judgment dismissal of plaintiff's disparate impact claim because the plaintiff's allegation that "the scheduling process overall has had a disparate impact" was insufficient to establish a policy or practice); *Davis v. Cintas Corp.*, 717 F.3d 476, 497-98 (6th Cir. 2013) (affirming summary judgment dismissal of disparate impact claims and rejecting plaintiff's argument that the defendant's hiring system involving "subjective elements" was a policy or practice for purposes of a disparate impact claim).

Neither *Banks v. City of Albany*, 953 F. Supp. 28 (N.D.N.Y. 1997) nor *Martin v. Coinmach Corp.*, No. 15-cv-8137 (AJN) (SN), 2016 WL 6996182 (S.D.N.Y. Nov. 29, 2016), support Hernandez's position. In *Banks*, the court found that the selection of candidates based on the decision-maker's relationships with their families was a sufficiently specific policy. 953 F. Supp. at 33-34. There is no allegation here that MLB made crew chief and World Series decisions based on nepotism. *Martin* involved allegations of a "standardless merit increase policy." *Martin*, 2016 WL 6996182, at *4. By contrast, there are standards here: MLB based its decisions on leadership and situation management, which Hernandez expressly admitted are "valid criteria for a crew chief." (SA 137.) Hernandez's

36

gripe is with the selection process as a whole, which is insufficiently specific as a matter of law.

### C. Hernandez Failed To Present Evidence Of A Statistically Significant Disparity.

1. A Statistically Significant Disparity Requires Statistical Proof.

Even if Hernandez had identified a specific policy or practice, the District Court properly dismissed Hernandez's disparate impact claims because he failed to present any evidence of a statistically significant disparity in crew chief selections and World Series assignments, the *sine qua non* of disparate impact discrimination.

The concept of disparate impact was established by the United States Supreme Court in *Griggs v. Dukes Power Co.*, 401 U.S. 424 (1971), where the Court held that a plaintiff can establish a discrimination claim even if the employer does not intend to discriminate but "employment procedures or testing mechanisms . . . operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Id.* at 432. Since *Griggs*, the Supreme Court has explained that there is an exacting standard for establishing a *prima facie* case of disparate impact: a plaintiff must "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994-95. *See also Ricci v. DeStefano*, 557 U.S. 557,

587 (2009) ("[A] prima facie case of disparate-impact liability [is,], essentially, a threshold showing of a significant statistical disparity . . .").

Consistent with the Supreme Court precedent establishing the centrality of statistical evidence in disparate impact cases, this Court has recognized that "statistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001). *See also M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 273 (2d Cir. 2012) (disparate impact "requires a plaintiff to make a statistical showing that a challenged employment practice has a disparate adverse impact on the protected class."); *Gulino*, 460 F.3d at 382, citing 42 U.S.C. § 2000e-2(k)(1)(A)(i) ("The plaintiff must [] produce statistical evidence showing that the challenged practice 'causes a disparate impact on the basis of race . . .'"). Other Circuit courts have also emphasized the importance of a statistical showing. *See, e.g.*, *Harris v. Dep't of Child. & Families*, No. 21-11581, 2022 WL 247982, at *2 (11th Cir. Jan. 27, 2022) (affirming summary judgment for the defendant because the plaintiff "was required to offer statistical evidence" to show that the defendant's practice caused the exclusion of African American candidates for promotion); *Green v. City of Philadelphia*, No. 21-1034, 2022 WL 1165644, at *3 (3d Cir. Apr. 20, 2022) (affirming summary judgment for the defendant because the plaintiff "failed to offer anything more than raw statistical data" to prove that

the defendant's practice "caused a disparate impact," and "[w]ithout statistical analysis, it is impossible for a jury to reasonably conclude that the difference in the raw percentages is caused by the [defendant's policy]").

The U.S. Equal Employment Opportunity Commission ("EEOC") has similarly articulated that establishing a disparate impact under Title VII "ordinarily requires a statistical analysis." *Employment Tests and Selection Procedures*, EEOC Fact Sheet EEOC-NVTA-2007-2 (Dec. 1, 2007). *See also Section 15 - Race and Color Discrimination*, EEOC Compliance Manual, EEOC-CVG-2006-1, (Apr. 19, 2006) ("Proving unlawful disparate impact under Title VII first requires a statistical demonstration that the employer has an employment policy that causes a significant disparate impact based on race (or another protected trait).").[10]

> 2. The "Inexorable Zero" Theory Is Not A Substitute For The Required Statistical Proof And Does Not Establish A Statistically Significant Disparity.

Hernandez ignores his obligation to proffer evidence of a statistically significant disparity and instead bases his disparate impact claims entirely on the so-called "inexorable zero." (Pl. Br. 24-37.) According to Hernandez, he can meet his evidentiary burden by showing that no black or Hispanic umpires were

---

[10] *See Employment Tests and Selection Procedures*, EEOC Fact Sheet EEOC-NVTA-2007-2, https://www.eeoc.gov/laws/guidance/employment-tests-and-selection-procedures# (Dec. 1, 2007); *Section 15 - Race and Color Discrimination*, EEOC Compliance Manual, EEOC-CVG-2006-1, https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#I (Apr. 19, 2006).

promoted to crew chief in the few years in question, without regard to the size of the workforce *or* the number of crew chief openings.[11]  But the Supreme Court clearly stated that a "plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is racial *imbalance* in the work force." *Wards Cove Packing Co., Inc.*, 490 U.S. at 657 (emphasis in original).  *See also Robinson*, 267 F.3d at 160, citing *Brown*, 163 F.3d at 712 ("Allegations which contend only that there is a bottom line racial imbalance in the work force are insufficient.").

In his appeal, Hernandez claims that, "[a]s to the disparate impact claim, the District Court chose not to follow the line of cases recognizing the significance of the "inexorable zero."'  (Pl. Br. 23-24.)  However—and fatal to his appeal—Hernandez does not cite a single case in this Circuit or elsewhere where a court has held that the "inexorable zero" theory sufficed to survive summary judgment on a claim of disparate impact, nor could he.  That is because the "inexorable zero" is a theory used to support an inference of discriminatory motive in *disparate treatment* discrimination claims; it is not a substitute for the statistical analysis required to establish a *disparate impact*.

---

[11] Hernandez does not argue the "inexorable zero" theory as to World Series assignments.  (Pl. Br. 8 n. 3.)  Because MLB assigned minority umpires to work in the World Series on multiple occasions, that theory is not applicable.  *See supra* at 3.

In discrimination jurisprudence, the phrase "inexorable zero" has its roots in the Supreme Court's decision in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 (1977), which Hernandez cites. That case involved allegations of "regular[] and purposeful[]" race discrimination in a workforce of 6,472 employees, of which fewer than ten percent were minorities. *Id.* at 337. There was no disparate impact claim at issue in *Teamsters*. The Court explained in a footnote that an "inference of discrimination" arose due to "the inexorable zero", *i.e.*, the fact that no or very few minorities were hired to the position in question in a large workforce over an extended period of time. *Id.* at 342 n.23. The Supreme Court made clear that the "inexorable zero" was relevant because of the large workforce at issue, and that "[c]onsiderations such as small sample size may, of course, detract from the value of such evidence." *Id.* at 339 n.20. The *Teamsters* case considered the "inexorable zero" as evidence of intentional race discrimination, which was supported by other record evidence of discriminatory animus. That case, including its discussion of the "inexorable zero", is therefore irrelevant to the issue of disparate impact.

Hernandez's extensive reliance on *United States v. City of New York*, 713 F. Supp. 2d 300 (S.D.N.Y. 2010), as well as his reliance on *Brennan v. City of White Plains*, No. 97-cv-2709 (RWS), 1998 WL 75692, at *7 (S.D.N.Y. Feb. 20, 1998) and *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647 (5th Cir. 1983), is misplaced for

the same reason.  Not only are those decisions not binding on this Court, any discussion of the inexorable zero theory was limited to claims of disparate treatment and are therefore irrelevant to Hernandez's appeal of the dismissal of his disparate impact claims because Hernandez's reliance on the inexorable zero theory is limited to the appeal of his disparate impact claims—not disparate treatment.  Indeed, Hernandez does not argue on appeal that the District Court erred by dismissing his disparate treatment claims based on the "inexorable zero" theory.  (Pl. Br. 42-45).  He has now waived any such argument.  *See supra* n.7.[12]

Leaving aside that the "inexorable zero" may, in certain circumstances, support a *disparate treatment* claim because that issue is no longer relevant to this appeal, it does not establish a prima facie case of *disparate impact*, which must be premised on a facially neutral practice that has a statistically significant adverse impact.  It is impossible to assess whether an adverse impact exists without analyzing the number of job openings and how many qualified employees there are who could conceivably fill those roles.  This is precisely why courts have held

---

[12] Even if the "inexorable zero" was enough to establish an "inference of discrimination" for purposes of Hernandez's *prima facie* case of disparate treatment—which it is not for the reasons expressed in the decision below—it would still be insufficient here because Judge Oetken assumed, without deciding, that Hernandez had established his *prima facie* case of disparate treatment and focused on the question of whether Hernandez raised a disputed issue of fact as to pretext, which he failed to do.  (SPA 16.)

repeatedly that the absence of a protected class member in a particular position, on its own, is insufficient as a matter of law to establish a disparate impact. *See, e.g.*, *Deleon v. Putnam Valley Bd. of Educ.*, No. 03-cv-10274 (CM), 2006 WL 236744, at *9-10 (S.D.N.Y. Jan. 26, 2006) (evidence of an absence of African-American teachers was insufficient to establish disparate impact without a comparison to the relevant labor pool); *Capruso v. Hartford Fin. Servs. Grp., Inc*, No. 01-cv-4250 (RLC), 2003 WL 1872653, at *6 (S.D.N.Y. Apr. 10, 2003) (finding that evidence of a purported "inexorable zero" failed as a matter of law because the plaintiff did not compare the promotion rate of females to that of males and therefore failed to show a statistically significant disparate impact on her protected class). *See also EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1275 n.11, 1276 (11th Cir. 2000) (mere fact that the defendant hired no women was insufficient, on its own, to establish disparate impact because the small number of women who actually applied for the position rendered the zero hiring rate consistent with the selection rate that would be expected to occur randomly); *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1254 (7th Cir. 1990) (finding the absence of black supervisors insufficient to support a disparate impact claim because "underrepresentation statistics cannot make out a prima facie case of disparate impact").

*Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007 (2d Cir. 1980) does not help Hernandez because the Court's discussion of the "inexorable zero" was in the

43

context of the employer's business necessity defense—not part of the required statistical proof. *Id.* at 1015. The Court expressly recognized that the business necessity defense comes into play only after the Plaintiff makes the required statistical showing of "statistics demonstrating that the employer's selection methods or employment criteria result in employment of a disproportionately larger share of whites than of blacks out of a pool of qualified candidates." *Id.* Neither *Grant*—nor any other authority—has ever held that the "inexorable zero" is a substitute for that required statistical showing, which undisputedly is missing here.

The non-binding district court cases on which Hernandez relies are inapposite because they all involved statistical evidence showing a disparity. For example, in *Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809 (E.D.N.Y. 1999), the court actually emphasized the role of statistics in disparate impact cases. The court relied on the plaintiff's *expert's statistical analysis* using the Fisher's Exact test, which is the same statistical tool utilized by MLB's expert in this case demonstrating the *absence* of a statistically significant disparity. *Id.* at 823.[13]

---

[13] In *Victory*, the plaintiff's expert calculated a probability value of 0.05, meaning that the decisions resulting in only men receiving promotions would have occurred by chance only 5 percent of the time. *Id.* at 823. The court found that the expert's report was sufficient to establish "a foundation for a disparate impact claim . . . albeit by a slim margin." *Id.* at 824. By stark contrast, MLB's expert found that

44

Similarly, *E.E.O.C. v. Andrew Corp.*, No. 81-cv-4359 (EEB), 1989 WL 32884

(N.D. Ill. Apr. 3, 1989), is a decision following a bench trial that likewise included

experts' detailed and technical statistical analyses of disparate impact.

Notwithstanding the different procedural posture, that case actually undermines

Hernandez's position because it supports the need for statistical evidence in

disparate impact cases.

### 3. A Statistical Showing Remains A Requirement When Sample Sizes Are Small.

Hernandez claims that he is relieved of a statistical showing in this case

because the sample sizes at issue are relatively small. Not surprisingly, he does not

cite any authority that supports this specious proposition because it is wrong as a

matter of law. Case after case has recognized the exact opposite of what

Hernandez contends here—when sample sizes are small, a statistically significant

adverse impact cannot be established without the required statistical analysis. *See*

*Martinez v. Conn. Dep't of Corr.*, 125 F. Supp. 3d 397, 408-10 (D. Conn. 2015)

(finding evidence that 0% of minority applicants were promoted while 12.5% of

white applicants were promoted insufficient to establish disparate impact because

the sample size was small and the plaintiffs failed to submit expert statistical

analysis suggesting this data was statistically significant); *Teasdale v. City of N.Y.*,

_____

the chances of selecting a white umpire for crew chief, by chance alone, was
between 59% and 79%. (SA 492-93 ¶¶ 15-17; SA 514-15 ¶¶ 30-31.)

No. 08-cv-1684 (KAM), 2013 WL 5300699, at *9 (E.D.N.Y. Sept. 18, 2013) (finding plaintiff's argument based on a sample size of eight people "deeply flawed" and noting that the EEOC has "cautioned that '[g]reater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant.'"), citing 29 C.F.R. § 1607.4(D), *aff'd sub nom.*, *Teasdale v. N.Y.C. Fire Dep't, FDNY*, 574 F. App'x 50 (2d Cir. 2014) (summary order).  Hernandez's "inexorable zero" theory turns the concept of disparate impact on its head, because without considering the number of applicants and the number of available positions, the mere lack of a particular group in a particular position has no meaning.

None of the cases that Hernandez cites support his position.  As noted above, Hernandez erroneously relies on disparate treatment cases in an attempt to excuse his failure to provide statistical analysis in support of his disparate impact claims.  See *supra* at 40-42.  The few disparate impact cases that he cites actually underscore the need for statistical evidence in disparate impact cases.  Hernandez relies on *Waisome v. Port Authority of New York & New Jersey*, 948 F.2d 1370 (2d Cir. 1991), in support of his argument that statistics can be ignored when sample sizes are small, but in that case the Second Circuit reached the opposite conclusion when it reversed dismissal of a Title VII disparate impact claim because "the statistical evidence . . . evidence[d] a disparity significant enough to suggest a

46

violation of Title VII." *Id.* at 1372. *Waisome* reinforces MLB's position that Hernandez was required to adduce evidence of a statistically significant disparate impact in order to survive summary judgment.

Hernandez argues that the District Court erred by citing to *Woodson v. Pfizer, Inc.*, 34 F. App'x 490 (7th Cir. 2002), for the proposition that there must be a "statistically large workforce for the inexorable zero to be relevant," and argues that *Woodson* is somehow inconsistent with *Waisome*. In *Woodson*, the Seventh Circuit noted that when there is a small number of employees in the workforce at issue, statistical evidence is of no value in proving an employment discrimination claim. *Id* at 493. And in *Waisome*, the Court held that because sample sizes were small it was appropriate for the plaintiff to supplement statistics drawn from small sample sizes with related statistics from larger samples. *Waisome*, 948 F.3d at 1379-80. Nothing in *Waisome* or any other case supports Hernandez's contention that he can establish a *prima facie* case of disparate impact without any statistical analysis of promotion or selection rates whatsoever.[14]

---

[14] Indeed, in *Waisome*, the plaintiff's disparate impact claim was not even based on the "inexorable zero"—it was based on an alleged disparity in the rates at which black and white police officers passed a written examination. *Waisome*, 948 F.2d at 1378-79.

47

Hernandez also relies on *United States v. City of Yonkers*, 609 F. Supp. 1281 (S.D.N.Y. 1984), but that case also underscores the need for statistical evidence in disparate impact cases, including for small sample sizes. In *City of Yonkers*, the plaintiff presented statistical evidence that certain tests had a statistically significant adverse impact on black and Hispanic candidates for police officer positions. *Id.* at 1286-87. The court rejected the argument that small sample sizes made the statistical analysis unreliable—the very same argument that Hernandez has advanced here—and explained that the "standard deviation analysis takes account of sample size as well as degree of disparity in measuring statistical significance." *Id.* at 1289. While the court also considered nonstatistical evidence, it did so in addition to, and not instead of, the statistical evidence that the plaintiff presented. *Id.* at 1289-90.

4. The Undisputed Statistical Evidence Confirms That There Was No Statistically Significant Disparity In This Case.

Hernandez's suggestion that he is relieved of proffering a statistical analysis because of the sample size at issue ignores completely the statistical analysis models that are specifically designed for small sample sizes. Hernandez hardly mentions, let alone attempts to rebut, MLB's expert evidence on this subject. The undisputed statistical evidence—the results of the Fisher's Exact test, a statistical analysis specifically designed for small sample sizes, confirmed that there was no statistical significance to the fact that there were no minority umpires promoted to

48

crew chief between 2011 and 2018 or that minority umpires were selected for the World Series on three occasions between 2011 and 2018. (SA 359-61; SA 493-95 ¶¶ 16-21; *see supra* at 17.)[15]

As a general matter, and consistent with Supreme Court precedent, the Second Circuit has held that an outcome is "statistically significant" if the chances of that outcome occurring randomly are less than or equal to five percent. *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989), citing *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977). Here, the probability that no minorities would have been promoted to crew chief ranged between 59% and 79% in the years in which Hernandez applied. (SA 492-95 ¶¶ 16-17.) According to Dr. Martin's undisputed testimony, "promotion rates and selection rates for minorities d[id] not differ from the promotion rates and selection rates for white umpires." (SA 361.) Likewise, the chances of randomly selecting the number of minority umpires who worked in each World Series between 2011 and

---

[15] The Fisher's Exact test is the most appropriate test for relatively small sample sizes like those at issue here. (*See supra* at 17.) Dr. Martin also used an alternative Chi-Squared test for larger sample sizes and the results were qualitatively similar. (SA 360; SA 515 ¶ 33 n.29.) Courts have relied on this analysis in comparable circumstances. *See, e.g.*, *Bridgeport Guardians, Inc. v. City of Bridgeport*, 735 F. Supp. 1126, 1131-32 (D. Conn. 1990), *aff'd*, 933 F.2d 1140 (2d Cir. 1991); *Ries v. Winona Cnty.*, 10-cv-1715 (JNE) (JJK), 2011 WL 2200622, at *7-8 (D. Minn. May 6, 2011), *report & recommendation adopted*, 2011 WL 2173698 (D. Minn. Jun. 1, 2011); *Stackhouse v. Pa. State Police*, No. 01-cv-223 (CCC), 2005 WL 8167743, at *2-3 (M.D. Pa. Oct. 4, 2005).

2018 ranged between 28% and 91.6% (SA 495-96 ¶¶ 18-21; SA 515 ¶¶ 32-33; SA 570-93) —again, exponentially higher than the extremely low probability levels (i.e., below 5 percent or at most 10 percent) needed to support a statistically significant difference in selection rates between minority and non-minority umpires.  (SA 492-93 ¶ 15.)

Judge Oetken specifically relied on Dr. Martin's undisputed statistical evidence in concluding that "the fact that no or very few minorities were promoted was 'statistically meaningless.'"  (SPA 28.)  Hernandez does not even address Dr. Martin's findings, let alone attempt to refute them.

5. <u>Hernandez Cannot Establish A Disparate Impact By Alleging Intentional Discrimination.</u>

Hernandez cannot salvage his disparate impact claims by alleging that there were a small number of minorities to begin with.  (Pl. Br. 29-30.)  That is a thinly veiled claim of discriminatory animus in the hiring process, which is not at issue in this case.  As explained above, Hernandez has all but abandoned his disparate treatment claims—which never alleged discrimination in hiring, only in promotions to crew chief and selections to the World Series.  His claim that MLB intentionally suppressed the number of minority candidates is quintessential bootstrapping.  In any event, there is no evidence whatsoever that MLB engaged in discriminatory hiring practices.  To the contrary, the record reflects that MLB has been unwavering in its commitment to improve diversity in the umpiring ranks,

and the undisputed record evidence confirms all of MLB's extensive efforts to meet that objective. (SA 269-71; SA 371; SA 377-78; SA 386; SA 336; SA 346.) Hernandez cannot overcome the numerous legal defects in his disparate impact promotion claim by baselessly alleging that MLB engaged in intentional discriminatory hiring practices.

Hernandez cites no authority to the contrary. (Pl. Br. 30). As described above, *City of New York*, 713 F. Supp. 2d at 318, is of no utility because that case involved intentional discrimination claims only—not disparate impact claims. Hernandez also cites to *Brennan*, 1998 WL 75692, at *7, but that case is even more inapposite as it is a decision denying the defendant's Rule 12(b)(6) motion to dismiss the plaintiff's disparate treatment claims on timeliness grounds. *Brennan* did not involve disparate impact claims and has no conceivable connection to Hernandez's appeal.

In sum, Hernandez's disparate impact claims were properly dismissed because he failed to adduce *any* evidence of a statistically significant disparity in promotion and selection rates between white and minority umpires.

### D. Hernandez Failed To Show A Causal Connection.

Even if Hernandez had proffered statistical evidence of a disparity, his disparate impact claims were properly dismissed because he did not even attempt to show a causal connection between MLB's reliance on leadership and situation

51

management in making crew chief and World Series decisions and any alleged disparity in MLB's selection of minority umpires for World Series and crew chief roles.  While there is ample undisputed evidence in the record that Hernandez's deficient leadership ability and poor situation management skills were the principal impediments to *his* career advancement, there is nothing in the record to suggest that these factors affected any other minority umpire.  Indeed, the record reflects that MLB selected minority umpires for World Series roles between 2011-2017, the exact time frame that Hernandez alleges MLB discriminated against him.  *See supra* at 3.  Therefore, even if Hernandez articulated a policy and the "inexorable zero" was sufficient to establish a statistically significant disparity, Hernandez has not established any connection between MLB's promotion criteria and the number of minority crew chiefs and World Series umpires.

### E.  MLB's Reliance On Subjective Qualities Is Consistent With Business Necessity.

Without citation to any authority, Hernandez falsely claims that MLB is subject to a "heightened" burden of establishing business necessity in this case, but there is no such standard.  (Pl. Br. 37.)  Instead, MLB need only rebut Hernandez's prima facie case (assuming he were able to establish one) by "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity."  *Gulino*, 460 F.3d at 382, citing 42 U.S.C. 2000e-2(k)(1)(A)(i) (alteration original).  The Supreme Court has explained that "[i]n the

52

context of subjective or discretionary employment decisions, the employer will often find it easier than in the case of standardized tests to produce evidence of a 'manifest relationship to the employment in question.'" *Watson*, 487 U.S. at 999.

MLB's consideration of leadership ability and situation management for umpires to serve in leadership positions and work the highest profile games is indisputably job related and fully comports with business necessity. *See, e.g., Byrd v. Philadelphia Gas Works*, No. 19-cv-5305 (MMB), 2021 WL 5867881, at *12-13 (E.D. Pa. Dec. 10, 2021) (finding that the employer's preference for candidates with managerial experience, supervisory skills, and leadership skills to be promoted to Supervisor had a "clear business justification"); *Sullivan v. Standard Chlorine of Del., Inc.*, 845 F. Supp. 167, 177 (D. Del. 1994) (qualifications for managerial position "including leadership ability, interpersonal skills, and communication skills, necessarily involve some subjective evaluation."). The Court should decline Hernandez's invitation to act as a roving commission to second-guess the factors that experts in professional baseball deem important in the evaluation of Major League umpires to serve as permanent crew chiefs and umpire in the World Series. *See O'Leary v. N.Y. State Unified Court Sys.*, No. 05-cv-6722 (HB), 2007 WL 2244483, at *7 (S.D.N.Y. Aug. 6, 2007) ("Defendant's decisions regarding the professional experience and characteristics sought in a candidate . . . are entitled to deference.") (internal citations omitted).

On appeal, Hernandez's claims that MLB "does not cite to any evidence" in support of its need to consider leadership ability and situation management skills in deciding which umpires to place in leadership positions and work the highest profile games. (Pl. Br. 38). That is demonstrably false, as Hernandez himself admitted that these are valid considerations. (SA 137.) And the record is replete with additional evidence regarding the importance of these attributes for crew chiefs and umpires in World Series games. (*See, e.g.*, SA 185-86; SA 420-22 ¶¶ 15-16, 20; SA 426-27 ¶¶ 29, 34.)

Hernandez also claims that it was error for the court to grant summary judgment without MLB presenting expert evidence of its need to consider these important and common sense characteristics in making promotion decisions, but there is no such requirement. *See, e.g.*, *Zahorik v. Cornell Univ.*, 729 F.2d 85, 96 (2d Cir. 1984). Hernandez purports to cite *Banks*, 953 F. Supp. at 36, for this baseless proposition, but nowhere in that decision did the court state that expert evidence is required to establish business necessity.[16]

---

[16] *Banks* states, in dicta, that there are cases where employers have been required to present expert evidence. *Id.* The 40-year-old cases from other jurisdictions that the *Banks* decision cites for that proposition all related to airlines' policies of removing flight attendants from duty upon learning of their pregnancies. Those cases involved specialized medical evidence concerning a safety-based business necessity defense, where the employer argued that certain precautions were medically necessary to avoid health risks to pregnant women in a particular profession. *See Id.*, citing *Burwell v. E. Air Lines*, *Inc.*, 633 F.2d 361 (4th Cir. 1980); *Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670 (9th Cir. 1980);

Hernandez's criticism of the District Court for assuming "*arguendo*" that MLB demonstrated the business necessity of its promotion practices is inapt. (Pl. Br. 39) The portion of the District Court's quote that Hernandez disingenuously replaces with ellipses makes clear that the District Court *first* assumed that Hernandez had made the required statistical showing—which he indisputably failed to do—which is required before even getting to the business necessity defense. (SPA 30.) The District Court concluded Hernandez had not gotten past the prima facie stage, and then for good measure concluded that, even if he had, he would have been unable to show that an alternative practice would eliminate any disparity at issue, *id.*, for the reasons discussed immediately below.

### F. Hernandez Failed To Present Evidence Of An Alternate Practice That Would Adequately Serve MLB's Legitimate Business Needs.

Hernandez has the burden "to show that a different test or selection mechanism would have served the employer's legitimate interests 'without a similarly undesirable racial effect.'" *M.O.C.H.A. Soc'y, Inc.*, 689 F.3d at 274, citing *Watson*, 487 U.S. at 998. When assessing an employer's discretionary employment practice, "it must be borne in mind that [c]ourts are generally less competent than employers to restructure business practices[.]'" *Watson*, 487 U.S. at 999, citing *Furnco Constr. Corp v. Waters*, 438 U.S. 567, 578 (1978). *See also*

---

*Levin v. Delta Air Lines, Inc.*, 730 F.2d 994 (5th Cir. 1984). That line of cases has no relevance here.

*Zahorik*, 729 F.2d at 96 ("[The] criteria [used by a university to award tenure], however difficult to apply and however much disagreement they generate in particular cases, are job related . . . [i]t would be a most radical interpretation of Title VII for a court to enjoin use of an historically settled process and plainly relevant criteria largely because they lead to decisions which are difficult for a court to review.")

Hernandez suggests that the entire umpire department should collaborate in making promotion decisions rather than having Torre as the ultimate decision-maker, and that any decisions should focus on objective rather than subjective criteria. (Pl. Br. 40.) Hernandez fails to articulate in his appeal how his alternative practice would serve MLB's needs or eliminate the alleged disparity. He simply says in the utmost conclusory manner that "[e]ach of those proposed alternative practices eliminates the problems inherent in MLB's current policies by requiring MLB to focus on more objective data and by taking full authority over promotion decisions out of the hands of a single non-minority individual (Torre) and putting that authority instead into the hands of a larger group." (Pl. Br. 40-41). Instead of carrying his burden by explaining how his proposed alternative practice would satisfy MLB's needs *and* eliminate the disparity (a disparity that does not exist), Hernandez argues on appeal that the District Court erred because MLB did not

56

prove that his alternatives would not work. (Pl. Br. 41). That is backwards and ignores the applicable burden shifting framework.

In any event, the undisputed record evidence established that relying on objective metrics like seniority and proficiency in calling balls and strikes would not serve MLB's basic business need of having individuals who have the ability to lead in leadership positions. Being a crew chief or working in the World Series is not about how many years an umpire has worked or calling balls and strikes; it is about being a leader on the field and not buckling under pressure. The "objective" information Hernandez cites does not inform which umpires will make good leaders or perform best on baseball's biggest stage. (SA 420-22 ¶¶ 14, 15, 18.) In addition, because all umpires at the Major League level are highly proficient in making accurate calls, and there is not a wide disparity between high performing and low performing umpires across those metrics, (SA 159; SA 355-56), distinguishing umpires on this basis would not be particularly meaningful. Furthermore, to the extent Hernandez suggests that employment decisions should be based on objective criteria alone, such as seniority and "numbers", that ignores the undisputed fact that his own collective bargaining representative agreed to vest MLB with the ability to exercise discretion in promotion and selection decisions based on factors it deems "appropriate," and expressly says that seniority shall not control. (SA 6-7; SA 10; SA 27-28; SA 34-35.) As for Hernandez's contention

that MLB should require "collaboration" in selecting crew chiefs, the record is clear and undisputed that MLB executives already work together in making crew chief decisions.  (SA 419 ¶ 11; SA 608 ¶¶ 1, 3-5; SA 307; SA 2 ¶ 8.)

Hernandez does not identify a single disputed issue of fact to disturb the District Court's conclusion that he failed to show how either of his proposed alternatives would eliminate the alleged disparity at issue while meeting MLB's business needs.  For this reason, even if Hernandez had made out a prima facie case, which he did not, he has not met his burden of showing an alternate practice.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the District Court granting MLB's motion for summary judgment and dismissing Hernandez's claims in their entirety with prejudice.

Dated:      New York, New York
              August 31, 2022

By:   */s/ Neil H. Abramson*
      NEIL H. ABRAMSON
      ADAM M. LUPION
      RACHEL S. PHILION
      RACHEL S. FISCHER
      PROSKAUER ROSE LLP
      *Attorneys for Defendants-Appellees*
      Eleven Times Square
      New York, New York 10036
      (212) 969-3000

58

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned counsel certifies that this document complies as follows:

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains <u>13,982</u> words.

2.     The document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Neil H. Abramson*
Neil H. Abramson
